(Slip Opinion)      OCTOBER TERM, 2007      1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MEADWESTVACO CORP., SUCCESSOR IN INTEREST TO MEAD CORP. *v.* ILLINOIS DEPARTMENT OF REVENUE ET AL.

### CERTIORARI TO THE APPELLATE COURT OF ILLINOIS, FIRST DISTRICT

No. 06–1413. Argued January 16, 2008—Decided April 15, 2008

A State may tax an apportioned share of the value generated by a multistate enterprise's intrastate and extrastate activities that form part of a "'unitary business.'" *Hunt-Wesson, Inc.* v. *Franchise Tax Bd. of Cal.*, 528 U. S. 458, 460. Illinois taxed a capital gain realized by Mead, an Ohio corporation that is a wholly owned subsidiary of petitioner, when Mead sold its Lexis business division. Mead paid the tax and sued in state court. The trial court found that Lexis and Mead were not unitary because they were not functionally integrated or centrally managed and enjoyed no economies of scale. It neverthe-less concluded that Illinois could tax an apportioned share of Mead's capital gain because Lexis served an operational purpose in Mead's business. Affirming, the State Appellate Court found that Lexis served an operational function in Mead's business and thus did not address whether Mead and Lexis formed a unitary business.

Held:

   1. The state courts erred in considering whether Lexis served an "operational purpose" in Mead's business after determining that Lexis and Mead were not unitary. Pp. 6–13.

    (a) The Commerce and Due Process Clauses impose distinct but parallel limitations on a State's power to tax out-of-state activities, and each subsumes the "broad inquiry" " 'whether the taxing power exerted by the state bears fiscal relation to protection, opportunities and benefits given by the state,' " *ASARCO Inc.* v. *Idaho Tax Comm'n*, 458 U. S. 307, 315. Because the taxpayer here did business in the taxing State, the inquiry shifts from whether the State may

tax to what it may tax.  Under the unitary business principle developed to answer that question, a State need not "isolate the intrastate income-producing activities from the rest of the business" but "may tax an apportioned sum of the corporation's multistate business if the business is unitary."  *Allied-Signal, Inc.* v. *Director, Div. of Taxation*, 504 U. S. 768, 772.  Pp. 6–8.

(b) To address the problem arising from the emergence of multistate business enterprises such as railroad and telegraph companies—namely, that a State could not tax its fair share of such a business' value by simply taxing the capital within its borders—the unitary business principle shifted the constitutional inquiry from the niceties of geographic accounting to the determination of a taxpayer's business unit.  If the value the State wished to tax derived from a "unitary business" operated within and without the State, the State could tax an apportioned share of that business' value instead of isolating the value attributable to the intrastate operation.  *E.g., Exxon Corp.* v. *Department of Revenue of Wis.*, 447 U. S. 207, 223.  But if the value derived from a "discrete business enterprise," *Mobil Oil Corp.* v. *Commissioner of Taxes of Vt.*, 445 U. S. 425, 439, the State could not tax even an apportioned share.  *E.g., Container Corp. of America* v. *Franchise Tax Bd.*, 463 U. S. 159, 165–166.  This principle was extended to a multistate business that lacked the "physical unity" of wires or rails but exhibited the "same unity in the use of the entire property for the specific purpose," with "the same elements of value arising from such use," *Adams Express Co.* v. *Ohio*, 165 U. S. 194, 221; and it has justified apportioned taxation of net income, dividends, capital gain, and other intangibles.  Confronting the problem of how to determine exactly when a business is unitary*,* this Court found in *Allied-Signal* that the "principle is not so inflexible that as new [finance] methods . . . and new [business] forms . . . evolve it cannot be modified or supplemented where appropriate," 504 U. S., at 786, and explained that situations could occur in which apportionment might be constitutional even though "the payee and the payor [were] not . . . engaged in the same unitary business," *id.,* at 787.  In that context, the Court observed that an asset could form part of a taxpayer's unitary business if it served an "operational rather than an investment function" in the business, *ibid.;* and noted that *Container Corp.*, *supra,* at 180, n. 19, made the same point.  Pp. 8–11.

(c) Thus, the "operational function" references in *Container Corp.* and *Allied-Signal* were not intended to modify the unitary business principle by adding a new apportionment ground.  The operational function concept simply recognizes that an asset can be a part of a taxpayer's unitary business even without a "unitary relationship" between the "payor and payee."  In *Allied-Signal* and in *Corn Products*

Syllabus

*Co.* v. *Commissioner*, 350 U. S. 46, the conclusion that an asset served an operational function was merely instrumental to the constitutionally relevant conclusion that the asset was a unitary part of the business conducted in the taxing State rather than a discrete asset to which the State had no claim. *Container Corp.* and *Allied-Signal* did not announce a new ground for constitutional apportionment, and the Illinois Appellate Court erred in concluding otherwise. Here, where the asset is another business, a unitary relationship's "hallmarks" are functional integration, centralized management, and economies of scale. See *Mobil Oil Corp.*, *supra*, at 438. The trial court found each hallmark lacking in finding that Lexis was not a unitary part of Mead's business. However, the appellate court made no such determination. Relying on its operational function test, it reserved the unitary business question, which it may take up on remand. Pp. 11–13.

2. Because the alternative ground for affirmance urged by the State and its *amici*—that the record amply demonstrates that Lexis did substantial business in Illinois and that Lexis' own contacts with the State suffice to justify the apportionment of Mead's capital gain—was neither raised nor passed upon in the state courts, it will not be addressed here. The case for restraint is particularly compelling here, since the question may impact other jurisdictions' laws. Pp. 13–14.

371 Ill. App. 3d 108, 861 N. E. 2d 1131, vacated and remanded.

ALITO, J., delivered the opinion for a unanimous Court. THOMAS, J., filed a concurring opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 06–1413

_____

## MEADWESTVACO CORPORATION, SUCCESSOR IN IN-TEREST TO THE MEAD CORPORATION, PETITIONER *v.* ILLINOIS DEPARTMENT OF REVENUE ET AL.

### ON WRIT OF CERTIORARI TO THE APPELLATE COURT OF ILLINOIS, FIRST DISTRICT

[April 15, 2008]

JUSTICE ALITO delivered the opinion of the Court.

The Due Process and Commerce Clauses forbid the States to tax "'extraterritorial values.'" *Container Corp. of America* v. *Franchise Tax Bd.*, 463 U. S. 159, 164 (1983); see also *Allied-Signal, Inc.* v. *Director, Div. of Taxation*, 504 U. S. 768, 777 (1992); *Mobil Oil Corp.* v. *Commissioner of Taxes of Vt.*, 445 U. S. 425, 441–442 (1980). A State may, however, tax an apportioned share of the value generated by the intrastate and extrastate activities of a multistate enterprise if those activities form part of a "'unitary business.'" *Hunt-Wesson, Inc.* v. *Franchise Tax Bd. of Cal.*, 528 U. S. 458, 460 (2000); *Mobil Oil Corp.*, *supra*, at 438. We have been asked in this case to decide whether the State of Illinois constitutionally taxed an apportioned share of the capital gain realized by an out-of-state corporation on the sale of one of its business divisions. The Appellate Court of Illinois upheld the tax and affirmed a judgment in the State's favor. Because we conclude that the state courts misapprehended the principles that we have developed for determining whether a

multistate business is unitary, we vacate the decision of
the Appellate Court of Illinois.

## I

## A

Mead Corporation (Mead), an Ohio corporation, is the
predecessor in interest and a wholly owned subsidiary of
petitioner MeadWestvaco Corporation. From its founding
in 1846, Mead has been in the business of producing and
selling paper, packaging, and school and office supplies.[1]
In 1968, Mead paid $6 million to acquire a company called
Data Corporation, which owned an inkjet printing tech-
nology and a full-text information retrieval system, the
latter of which had originally been developed for the U. S.
Air Force. Mead was interested in the inkjet printing
technology because it would have complemented Mead's
paper business, but the information retrieval system
proved to be the more valuable asset. Over the course of
many years, Mead developed that asset into the electronic
research service now known as Lexis/Nexis (Lexis). In
1994, it sold Lexis to a third party for approximately
$1.5 billion, realizing just over $1 billion in capital gain,
which Mead used to repurchase stock, retire debt, and pay
taxes.

Mead did not report any of this gain as business income
on its Illinois tax returns for 1994. It took the position
that the gain qualified as nonbusiness income that should
be allocated to Mead's domiciliary State, Ohio, under
Illinois' Income Tax Act (ITA). See Ill. Comp. Stat., ch. 35,
§5/303(a) (West 1994). The State audited Mead's returns
and issued a notice of deficiency. According to the State,
the ITA required Mead to treat the capital gain as busi-

---

[1] See Prospectus of MeadWestvaco Corporation 3 (Mar. 19,
2003), online at http://www.sec.gov/Archives/edgar/data/1159297/
000119312503085265/d424b5.htm (as visited Apr. 1, 2008, and avail-
able in Clerk of Court's case file); App. 9.

ness income subject to apportionment by Illinois.[2]  The State assessed Mead with approximately $4 million in additional tax and penalties.  Mead paid that amount under protest and then filed this lawsuit in state court.

The case was tried to the bench.  Although the court admitted expert testimony, reports, and other exhibits into evidence, see App. D to Pet. for Cert. 29a–34a, the parties' stipulations supplied most of the evidence of record regarding Mead's relationship with Lexis, see App. 9–20. We summarize those stipulations here.

B

Lexis was launched in 1973.  For the first few years it was in business, it lost money, and Mead had to keep it afloat with additional capital contributions.  By the late 1970's, as more attorneys began to use Lexis, the service finally turned a profit.  That profit quickly became substantial.  Between 1988 and 1993, Lexis made more than $800 million of the $3.8 billion in Illinois income that Mead reported.  Lexis also accounted for $680 million of the $4.5 billion in business expense deductions that Mead

_____

[2] When the sale of Lexis occurred in 1994, the ITA defined "business income" as "income arising from transactions and activity in the regular course of the taxpayer's trade or business," as well as "income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations."  Ill. Comp. Stat., ch. 35, §5/1501(a)(1) (West 1994).  This language mirrors the definition of "business income" in the Uniform Division of Income for Tax Purposes Act (UDITPA).  See UDITPA §1(a) (2002); see also §9 (subjecting "[a]ll business income" to apportionment).  In 2004, the Illinois General Assembly amended the definition of "business income" to "all income that may be treated as apportionable business income under the Constitution of the United States."  Pub. Act 93–840, Art. 25, §25–5 (codified at Ill. Comp. Stat., ch. 35, §5/1501(a)(1) (West 2004)); cf. *Allied-Signal, Inc.* v. *Director, Div. of Taxation*, 504 U. S. 768, 786 (1992) (declining to adopt UDITPA's "business income" test as the constitutional standard for apportionment).

claimed from Illinois during that period.

Lexis was subject to Mead's oversight, but Mead did not manage its day-to-day affairs. Mead was headquartered in Ohio, while a separate management team ran Lexis out of its headquarters in Illinois. The two businesses maintained separate manufacturing, sales, and distribution facilities, as well as separate accounting, legal, human resources, credit and collections, purchasing, and marketing departments. Mead's involvement was generally limited to approving Lexis' annual business plan and any significant corporate transactions (such as capital expenditures, financings, mergers and acquisitions, or joint ventures) that Lexis wished to undertake. In at least one case, Mead procured new equipment for Lexis by purchasing the equipment for its own account and then leasing it to Lexis. Mead also managed Lexis' free cash, which was swept nightly from Lexis' bank accounts into an account maintained by Mead. The cash was reinvested in Lexis' business, but Mead decided how to invest it.

Neither business was required to purchase goods or services from the other. Lexis, for example, was not required to purchase its paper supply from Mead, and indeed Lexis purchased most of its paper from other suppliers. Neither received any discount on goods or services purchased from the other, and neither was a significant customer of the other.

Lexis was incorporated as one of Mead's wholly owned subsidiaries until 1980, when it was merged into Mead and became one of Mead's divisions. Mead engineered the merger so that it could offset its income with Lexis' net operating loss carryforwards. Lexis was separately reincorporated in 1985 before being merged back into Mead in 1993. Once again, tax considerations motivated each transaction. Mead also treated Lexis as a unitary business in its consolidated Illinois returns for the years 1988 through 1994, though it did so at the State's insistence

and then only to avoid litigation.

Lexis was listed as one of Mead's "business segment[s]" in at least some of its annual reports and regulatory filings. Mead described itself in those reports and filings as "engaged in the electronic publishing business" and touted itself as the "developer of the world's leading electronic information retrieval services for law, patents, accounting, finance, news and business information." *Id.,* at 93, 59; App. D to Pet. for Cert. 38a.

C

Based on the stipulated facts and the other exhibits and expert testimony received into evidence, the Circuit Court of Cook County concluded that Lexis and Mead did not constitute a unitary business. The trial court reasoned that Lexis and Mead could not be unitary because they were not functionally integrated or centrally managed and enjoyed no economies of scale. *Id.,* at 35a–36a, 39a. The court nevertheless concluded that the State could tax an apportioned share of Mead's capital gain because Lexis served an "operational purpose" in Mead's business:

> "Lexis/Nexis was considered in the strategic planning of Mead, particularly in the allocation of resources. The operational purpose allowed Mead to limit the growth of Lexis/Nexis if only to limit its ability to expand or to contract through its control of its capital investment." *Id.,* at 38a–39a.

The Appellate Court of Illinois affirmed. *Mead Corp.* v. *Department of Revenue,* 371 Ill. App. 3d 108, 861 N. E. 2d 1131 (2007). The court cited several factors as evidence that Lexis served an operational function in Mead's business: (1) Lexis was wholly owned by Mead; (2) Mead had exercised its control over Lexis in various ways, such as manipulating its corporate form, approving significant capital expenditures, and retaining tax benefits and con-

trol over Lexis' free cash; and (3) Mead had described itself
in its annual reports and regulatory filings as engaged in
electronic publishing and as the developer of the world's
leading information retrieval service.  See *id.,* at 111–112,
861 N. E. 2d, at 1135–1136.  Because the court found that
Lexis served an operational function in Mead's business, it
did not address the question whether Mead and Lexis
formed a unitary business.  See *id.,* at 117–118, 861
N. E. 2d, at 1140.

The Supreme Court of Illinois denied review in January
2007.  *Mead Corp.* v. *Illinois Dept. of Revenue*, 222 Ill. 2d
609, 862 N. E. 2d 235 (Table).  We granted certiorari.  551
U. S. ___ (2007).

II

Petitioner contends that the trial court properly found
that Lexis and Mead were not unitary and that the Appel-
late Court of Illinois erred in concluding that Lexis served
an operational function in Mead's business.  According to
petitioner, the exception for apportionment of income from
nonunitary businesses serving an operational function is a
narrow one that does not reach a purely passive invest-
ment such as Lexis.  We perceive a more fundamental
error in the state courts' reasoning.  In our view, the state
courts erred in considering whether Lexis served an "op-
erational purpose" in Mead's business after determining
that Lexis and Mead were not unitary.

A

The Commerce Clause and the Due Process Clause
impose distinct but parallel limitations on a State's power
to tax out-of-state activities.  See *Quill Corp.* v. *North
Dakota*, 504 U. S. 298, 305–306 (1992); *Mobil Oil Corp.*,
445 U. S., at 451, n. 4 (STEVENS, J., dissenting); *Norfolk &
Western R. Co.* v. *Missouri Tax Comm'n*, 390 U. S. 317,
325, n. 5 (1968).  The Due Process Clause demands that

there exist "'some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax,'" as well as a rational relationship between the tax and the "'"values connected with the taxing State."'" *Quill Corp., supra*, at 306 (quoting *Miller Brothers Co.* v. *Maryland*, 347 U. S. 340, 344–345 (1954), and *Moorman Mfg. Co.* v. *Bair*, 437 U. S. 267, 273 (1978)). The Commerce Clause forbids the States to levy taxes that discriminate against interstate commerce or that burden it by subjecting activities to multiple or unfairly apportioned taxation. See *Container Corp.*, 463 U. S., at 170–171; *Armco Inc.* v. *Hardesty*, 467 U. S. 638, 644 (1984). The "broad inquiry" subsumed in both constitutional requirements is "'whether the taxing power exerted by the state bears fiscal relation to protection, opportunities and benefits given by the state'"—that is, "'whether the state has given anything for which it can ask return.'" *ASARCO Inc.* v. *Idaho Tax Comm'n*, 458 U. S. 307, 315 (1982) (quoting *Wisconsin* v. *J. C. Penney Co.*, 311 U. S. 435, 444 (1940)).

Where, as here, there is no dispute that the taxpayer has done some business in the taxing State, the inquiry shifts from whether the State may tax to what it may tax. Cf. *Allied-Signal*, 504 U. S., at 778 (distinguishing *Quill Corp.*, *supra*). To answer that question, we have developed the unitary business principle. Under that principle, a State need not "isolate the intrastate income-producing activities from the rest of the business" but "may tax an apportioned sum of the corporation's multistate business if the business is unitary." *Allied-Signal*, *supra*, at 772; accord, *Hunt-Wesson*, 528 U. S., at 460; *Exxon Corp.* v. *Department of Revenue of Wis.*, 447 U. S. 207, 224 (1980); *Mobil Oil Corp.*, *supra*, at 442; cf. 1 J. Hellerstein & W. Hellerstein, State Taxation ¶8.07[1], p. 8–61 (3d ed. 2001–2005) (hereinafter Hellerstein & Hellerstein). The court must determine whether "intrastate and extrastate activi-

ties formed part of a single unitary business," *Mobil Oil Corp.*, *supra*, at 438–439, or whether the out-of-state values that the State seeks to tax "'derive[d] from "unrelated business activity" which constitutes a "discrete business enterprise."'" *Allied-Signal*, *supra*, at 773 (quoting *Exxon Corp.*, *supra*, at 224, in turn quoting *Mobil Oil Corp.*, *supra*, at 439 (alteration in original)). We traced the history of this venerable principle in *Allied-Signal*, *supra*, at 778–783, and, because it figures prominently in this case, we retrace it briefly here.

B

With the coming of the Industrial Revolution in the 19th century, the United States witnessed the emergence of its first truly multistate business enterprises. These railroad, telegraph, and express companies presented state taxing authorities with a novel problem: A State often cannot tax its fair share of the value of a multistate business by simply taxing the capital within its borders. The whole of the enterprise is generally more valuable than the sum of its parts; were it not, its owners would simply liquidate it and sell it off in pieces. As we observed in 1876, "[t]he track of the road is but one track from one end of it to the other, and, except in its use as one track, is of little value." *State Railroad Tax Cases*, 92 U. S. 575, 608.

The unitary business principle addressed this problem by shifting the constitutional inquiry from the niceties of geographic accounting to the determination of the taxpayer's business unit. If the value the State wished to tax derived from a "unitary business" operated within and without the State, the State could tax an apportioned share of the value of that business instead of isolating the value attributable to the operation of the business within the State. *E.g., Exxon Corp.*, *supra*, at 223 (citing *Moorman Mfg. Co.*, *supra*, at 273). Conversely, if the value the State wished to tax derived from a "discrete

business enterprise," *Mobil Oil Corp.*, 445 U. S., at 439, then the State could not tax even an apportioned share of that value. *E.g., Container Corp.*, *supra*, at 165–166.

We recognized as early as 1876 that the Due Process Clause did not require the States to assess trackage "in each county where it lies according to its value there." *State Railroad Tax Cases*, 92 U. S., at 608. We went so far as to opine that "[i]t may well be doubted whether any better mode of determining the value of that portion of the track within any one county has been devised than to ascertain the value of the whole road, and apportion the value within the county by its relative length to the whole." *Ibid.* We generalized the rule of the *State Railroad Tax Cases* in *Adams Express Co.* v. *Ohio, State Auditor*, 165 U. S. 194 (1897). There we held that apportionment could permissibly be applied to a multistate business lacking the "physical unity" of wires or rails but exhibiting the "same unity in the use of the entire property for the specific purpose," with "the same elements of value arising from such use." *Id.,* at 221. We extended the reach of the unitary business principle further still in later cases, when we relied on it to justify the taxation by apportionment of net income, dividends, capital gain, and other intangibles. See *Underwood Typewriter Co.* v. *Chamberlain*, 254 U. S. 113, 117, 120–121 (1920) (net income tax); *Bass, Ratcliff & Gretton, Ltd.* v. *State Tax Comm'n*, 266 U. S. 271, 277, 280, 282–283 (1924) (franchise tax); *J. C. Penney Co.*, *supra*, at 443–445 (tax on the "privilege of declaring dividends"); cf. *Allied-Signal*, *supra*, at 780 ("[F]or constitutional purposes capital gains should be treated as no different from dividends"); see also 1 Hellerstein & Hellerstein ¶8.07[1] (summarizing this history).

As the unitary business principle has evolved in step with American enterprise, courts have sometimes found it difficult to identify exactly when a business is unitary. We confronted this problem most recently in *Allied-Signal*.

The taxpayer there, a multistate enterprise, had realized capital gain on the disposition of its minority investment in another business. The parties' stipulation left little doubt that the taxpayer and its investee were not unitary. See 504 U. S., at 774 (observing that "the question whether the business can be called 'unitary' . . . is all but controlled by the terms of a stipulation"). The record revealed, however, that the taxpayer had used the proceeds from the liquidated investment in an ultimately unsuccessful bid to purchase a new asset that would have been used in its unitary business. See *id.,* at 776–777. From that wrinkle in the record, the New Jersey Supreme Court concluded that the taxpayer's minority interest had represented nothing more than a temporary investment of working capital awaiting deployment in the taxpayer's unitary business. See *Bendix Corp.* v. *Director, Div. of Taxation*, 125 N. J. 20, 37, 592 A. 2d 536, 545 (1991). The State went even further. It argued that, because there could be "no logical distinction between short-term investment of working capital, which all concede is apportionable, . . . and all other investments," the unitary business principle was outdated and should be jettisoned. 504 U. S., at 784.

We rejected both contentions. We concluded that "the unitary business principle is not so inflexible that as new methods of finance and new forms of business evolve it cannot be modified or supplemented where appropriate." *Id.,* at 786; see also *id.,* at 785 ("If lower courts have reached divergent results in applying the unitary business principle to different factual circumstances, that is because, as we have said, any number of variations on the unitary business theme 'are logically consistent with the underlying principles motivating the approach'" (quoting *Container Corp.*, 463 U. S., at 167)).[3] We explained that

_____

[3] The dissent agreed that the unitary business principle remained

situations could occur in which apportionment might be constitutional even though "the payee and the payor [were] not . . . engaged in the same unitary business." 504 U. S*.,* at 787. It was in that context that we observed that an asset could form part of a taxpayer's unitary business if it served an "operational rather than an investment function" in that business. *Ibid.* "Hence, for example, a State may include within the apportionable income of a non-domiciliary corporation the interest earned on short-term deposits in a bank located in another State if that income forms part of the working capital of the corporation's unitary business, notwithstanding the absence of a unitary relationship between the corporation and the bank." *Id.,* at 787–788. We observed that we had made the same point in *Container Corp.*, where we noted that "capital transactions can serve either an investment function or an operational function." 463 U. S., at 180, n. 19; cf. *Corn Products Refining Co.* v. *Commissioner*, 350 U. S. 46, 50 (1955) (concluding that corn futures contracts in the hands of a corn refiner seeking to hedge itself against increases in corn prices are operational rather than capital assets), cited in *Container Corp.*, *supra*, at 180, n. 19.

C

As the foregoing history confirms, our references to "operational function" in *Container Corp.* and *Allied-Signal* were not intended to modify the unitary business principle by adding a new ground for apportionment. The concept of operational function simply recognizes that an asset can be a part of a taxpayer's unitary business even if

_____

sound, 504 U. S., at 790 (opinion of O'Connor, J.), but found merit in New Jersey's premise (and the New Jersey Supreme Court's conclusion) that no logical distinction could be drawn between short- or long-term investments for purposes of unitary analysis, *id.,* at 793 ("Any distinction between short-term and long-term investments cannot be of constitutional dimension"). We need not revisit that question here.

what we may term a "unitary relationship" does not exist
between the "payor and payee."  See *Allied-Signal*, *supra*,
at 791–792 (O'Connor, J., dissenting); Hellerstein, State
Taxation of Corporate Income from Intangibles: *Allied-
Signal* and Beyond, 48 Tax L. Rev. 739, 790 (1993) (here-
inafter Hellerstein).   In the example given in *Allied-
Signal*, the taxpayer was not unitary with its banker, but
the taxpayer's deposits (which represented working capital
and thus operational assets) were clearly unitary with the
taxpayer's business.  In *Corn Products*, the taxpayer was
not unitary with the counterparty to its hedge, but the
taxpayer's futures contracts (which served to hedge
against the risk of an increase in the price of a key cost
input) were likewise clearly unitary with the taxpayer's
business.  In each case, the "payor" was not a unitary part
of the taxpayer's business, but the relevant asset was.
The conclusion that the asset served an operational func-
tion was merely instrumental to the constitutionally rele-
vant conclusion that the asset was a unitary part of the
business being conducted in the taxing State rather than a
discrete asset to which the State had no claim.  Our deci-
sions in *Container Corp.* and *Allied-Signal* did not an-
nounce a new ground for the constitutional apportionment
of extrastate values in the absence of a unitary business.
Because the Appellate Court of Illinois interpreted those
decisions to the contrary, it erred.

Where, as here, the asset in question is another busi-
ness, we have described the "hallmarks" of a unitary
relationship as functional integration, centralized man-
agement, and economies of scale.  See *Mobil Oil Corp.*, 445
U. S., at 438 (citing *Butler Brothers* v. *McColgan*, 315 U. S.
501, 506–508 (1942)); see also *Allied-Signal*, *supra*, at 783
(same); *Container Corp.*, *supra*, at 179 (same); *F. W.
Woolworth Co.* v. *Taxation and Revenue Dept. of N. M.*,
458 U. S. 354, 364 (1982) (same).  The trial court found
each of these hallmarks lacking and concluded that Lexis

was not a unitary part of Mead's business. The appellate court, however, made no such determination. Relying on its operational function test, it reserved judgment on whether Mead and Lexis formed a unitary business. The appellate court may take up that question on remand, and we express no opinion on it now.

## III

The State and its *amici* argue that vacatur is not required because the judgment of the Appellate Court of Illinois may be affirmed on an alternative ground. They contend that the record amply demonstrates that Lexis did substantial business in Illinois and that Lexis' own contacts with the State suffice to justify the apportionment of Mead's capital gain. See Br. for Respondents 18–25, 46–49; Brief for Multistate Tax Commission as *Amicus Curiae* 19–29. The State and its *amici* invite us to recognize a new ground for the constitutional apportionment of intangibles based on the taxing State's contacts with the capital asset rather than the taxpayer.

We decline this invitation because the question that the State and its *amici* call upon us to answer was neither raised nor passed upon in the state courts. It also was not addressed in the State's brief in opposition to the petition. We typically will not address a question under these circumstances even if the answer would afford an alternative ground for affirmance. See *Glover* v. *United States*, 531 U. S. 198, 205 (2001) (citing *Taylor* v. *Freeland & Kronz*, 503 U. S. 638, 646 (1992)); *Lorillard Tobacco Co.* v. *Reilly*, 533 U. S. 525, 578 (2001) (THOMAS, J., concurring in part and concurring in judgment).

The case for restraint is particularly compelling here, since the question may impact the law of other jurisdictions. The States of Ohio and New York, for example, have both adopted the rationale for apportionment that respondents urge us to recognize today. See Ohio Rev.

Code Ann. §§5733.051(E)–(F) (West 2007 Supp. Pamphlet); N. Y. Tax Law Ann. §210(3)(b) (West Supp. 2008); see also *Allied-Signal Inc.* v. *Department of Taxation & Finance*, 229 App. Div. 2d 759, 762, 645 N. Y. S. 2d 895, 898 (3d Dept. 1996) (finding that a "sufficient nexus existed between New York and the dividend and capital gain income" of the nondomiciliary parent because "the corporations generating the income taxed . . . each have their own connection with the taxing jurisdiction"); 1 Hellerstein & Hellerstein ¶9.11[2][a]. Neither Ohio nor New York has appeared as an *amicus* in this case, and neither was on notice that the constitutionality of its tax scheme was at issue, the question having been raised for the first time in the State's brief on the merits. So postured, the question is best left for another day.[4]

───────────

[4] Resolving this question now probably would not spare the State a remand. The State calculated petitioner's tax liability by applying the State's tax rate to Mead's apportioned business income, which in turn was calculated by applying Mead's apportionment percentage to its apportionable business income. See App. 28; Ill. Comp. Stat., ch. 35, §5/304(a) (West 1994). But if a constitutionally sufficient link between the State and the value it wishes to tax is founded on the State's contacts with Lexis rather than Mead, then presumably the apportioned tax base should be determined by applying the State's four-factor apportionment formula not to Mead but to Lexis. Naturally, applying the formula to Lexis rather than Mead would yield a different apportionment percentage. See Brief for Multistate Tax Commission as *Amicus Curiae* 18–19, and n. 9; see also Hellerstein 802–803.

The Multistate Tax Commission seems to argue that the difference would not affect the result because application of the formula to Lexis would have yielded a higher apportionment percentage. See Brief for Multistate Tax Commission 18–19. *Amicus* argues, in other words, that petitioner has no cause to complain because it caught a break in the incorrect application of a lower apportionment percentage. *Amicus*' argument assumes what we are in no position to decide: that Lexis' own apportioned tax base was properly calculated. Had petitioner been on notice that Lexis, rather than Mead, would supply the relevant apportionment percentage, it might have persuaded the state courts that Lexis' apportionment percentage should have been even lower than

Opinion of the Court

## IV

The judgment of the Appellate Court of Illinois is vacated, and this case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

---

Mead's.   The State's untimely resort to an alternative ground for affirmance may have denied petitioner a fair opportunity to make that argument.

# SUPREME COURT OF THE UNITED STATES

_____

No. 06–1413

_____

MEADWESTVACO CORPORATION, SUCCESSOR IN IN-
TEREST TO THE MEAD CORPORATION, PETITIONER
*v.* ILLINOIS DEPARTMENT OF REVENUE ET AL.

ON WRIT OF CERTIORARI TO THE APPELLATE COURT OF
ILLINOIS, FIRST DISTRICT

[April 15, 2008]

JUSTICE THOMAS, concurring.

Although I join the Court's opinion, I write separately to express my serious doubt that the Constitution permits us to adjudicate cases in this area. Despite the Court's repeated holdings that "[t]he Due Process and Commerce Clauses forbid the States to tax 'extraterritorial values,'" *ante*, at 1 (quoting *Container Corp. of America* v. *Franchise Tax Bd.*, 463 U. S. 159, 164 (1983)), I am not fully convinced of that proposition.

To the extent that our decisions addressing state taxation of multistate enterprises rely on the negative Commerce Clause, I would overrule them. As I have previously explained, this Court's negative Commerce Clause jurisprudence "has no basis in the Constitution and has proved unworkable in practice." *United Haulers Assn., Inc.* v. *Oneida-Herkimer Solid Waste Management Authority*, 550 U. S. ___, ___ (2007) (THOMAS, J., concurring in judgment) (slip op., at 1)).

The Court's cases in this area have not, however, rested solely on the Commerce Clause. The Court has long recognized that the Due Process Clause of the Fourteenth Amendment may also limit States' authority to tax multistate businesses. See *Adams Express Co.* v. *Ohio State Auditor*, 165 U. S. 194, 226 (1897) (concluding that be-

cause "[t]he property taxed has its actual situs in the State
and is, therefore, subject to the jurisdiction, and . . . regu-
lation by the state legislature," the tax at issue did not
"amoun[t] to a taking of property without due process of
law").  I agree that the Due Process Clause requires a
jurisdictional nexus or, as this Court has stated, "some
definite link, some minimum connection, between a state
and the person, property or transaction it seeks to tax."
*Miller Brothers Co.* v. *Maryland*, 347 U. S. 340, 344–345
(1954); see *ante*, at 7.  But apart from that requirement, I
am concerned that further constraints—particularly those
limiting the *degree* to which a State may tax a multistate
enterprise—require us to read into the Due Process Clause
yet another unenumerated, substantive right.  Cf. *Troxel*
v. *Granville*, 530 U. S. 57, 80 (2000) (THOMAS, J., concur-
ring in judgment) (leaving open the question whether "our
substantive due process cases were wrongly decided and
. . . the original understanding of the Due Process Clause
precludes judicial enforcement of unenumerated rights").

Today the Court applies the additional requirement that
there exist "a rational relationship between the tax and
the values connected with the taxing State." *Ante*, at 7
(internal quotation marks omitted); see also *Moorman
Mfg. Co.* v. *Bair*, 437 U. S. 267, 273 (1978) (requiring that
"the income attributed to the State for tax purposes . . . be
rationally related to 'values connected with the taxing
State'" (quoting *Norfolk & Western R. Co.* v. *Missouri Tax
Comm'n*, 390 U. S. 317, 325 (1968))).  In my view, how-
ever, it is difficult to characterize this requirement as
providing an exclusively procedural safeguard against the
deprivation of property.  Scrutinizing the amount of multi-
state income a State may apportion for tax purposes comes
perilously close to evaluating the excessiveness of the
State's taxing scheme—a question the Fourteenth
Amendment does not grant us the authority to adjudicate.
See, *e.g.*, *Stewart Dry Goods Co.* v. *Lewis*, 294 U. S. 550,

562 (1935) ("To condemn a levy on the sole ground that it is excessive would be to usurp a power vested not in the courts but in the legislature, and to exercise the usurped power arbitrarily by substituting our conceptions of public policy for those of the legislative body"). Indeed, divining from the Fourteenth Amendment a right against disproportionate taxation bears a striking resemblance to our long-rejected *Lochner*-era precedents. See, *e.g.*, *Lochner* v. *New York*, 198 U. S. 45, 56–58 (1905) (invalidating a state statute as an "unreasonable, unnecessary and arbitrary interference with the right of the individual . . . to enter into those contracts . . . which may seem to him appropriate or necessary"). Moreover, the Court's involvement in this area is wholly unnecessary given Congress' undisputed authority to resolve income apportionment issues by virtue of its power to regulate commerce "among the several States." See U. S. Const., Art. I, §8, cl. 3.

Although I believe that the Court should reconsider its constitutional authority to adjudicate these kinds of cases, neither party has asked us to do so here, and the Court's decision today faithfully applies our precedents. I therefore concur.