No. 10       April 29, 2015       69

IN THE OREGON TAX COURT
REGULAR DIVISION

FISHER BROADCASTING COMPANY
& SUBSIDIARIES,
*Plaintiff,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant.*

(TC 5167)

Plaintiff (taxpayer) appealed to the Magistrate Division of the Tax Court as to a conference decision of Defendant Department of Revenue (the department) regarding an assessment of corporation excise tax, penalties, and interest. The matter was then specially designated to the Regular Division by joint petition of the parties. The parties proceeded on cross-motions for summary judgment. Taxpayer argued that its realized gain from a sale of its stock was not business income under ORS 314.610(1). The department argued that it was business income. Granting the department's motion, the court ruled that taxpayer's treatment of the stock at issue proved that it was not merely an asset on its balance sheet, but was instead an asset that through covenants in an indenture and the financing obtained through those covenants, was specifically devoted to and employed in the unitary television and radio business of taxpayer, and thus was business income. The court further ruled that taxpayer was responsible for payment of the penalty assessed because it did not have substantial authority for its treatment of an item on its return.

Oral argument on cross-motions for summary judgment was held November 17, 2014, in the courtroom of the Oregon Tax Court, Salem.

Gregg D. Barton, Perkins Coie LLP, Seattle, filed the motion and argued the cause for Plaintiff (taxpayer).

Darren Weirnick, Assistant Attorney General, Department of Justice, Salem, filed the motion and Marilyn J. Harbur, Senior Assistant Attorney General, Department of Justice, Salem, argued the cause for Defendant Department of Revenue (the department).

Decision for Defendant rendered April 29, 2015.

**HENRY C. BREITHAUPT, Judge.**

### I. INTRODUCTION

This corporation excise tax case for the 2003 through 2008 tax years is before the court on cross-motions

for summary judgment filed by Plaintiff (taxpayer) and Defendant (the department).

## II.   FACTS

The relevant facts have been established through stipulation, including stipulated exhibits. For the years at issue, those facts are as follows.

(1)   Taxpayer's parent company, Fisher Communications, Inc. (parent)[1] was a corporation organized under the laws of the state of Washington and at all relevant times had its headquarters and commercial domicile in the state of Washington. Parent was publically traded on the Nasdaq Global Market.

(2)   Taxpayer was a corporation organized under the laws of the state of Washington and at all relevant times had its headquarters and commercial domicile in the state of Washington. Taxpayer was wholly owned by parent.

(3)   On December 15, 2011, the department issued a Notice of Deficiency against taxpayer for tax year 2008.

(4)   On January 13, 2012, taxpayer filed an appeal and request for an in-person conference with the department.

(5)   Following an in-person conference on April 5, 2012, the department issued its Conference Decision Letter and Notice of Deficiency Assessment on August 10, 2012.

(6)   On or about October 22, 2012, taxpayer paid the department's assessment in full, including $483,133 in corporation excise tax, $261,234.65 in penalties and $83,897.03 in interest for tax year 2008.

(7)   Taxpayer filed its Complaint in this case by certified mail on October 24, 2012.

(8)   Taxpayer was incorporated in 1910.

(9)   Taxpayer regularly engaged in the television and radio broadcasting business from 1926 through 2013.

---

[1] For purposes of this order, the court will generally refer to both Plaintiff and parent as "taxpayer" except where separate reference is appropriate.

(10)   Throughout the audit period, taxpayer owned and operated television and radio stations in Washington, Oregon, Idaho, and Montana.

(11)   On December 31, 2007, taxpayer owned and operated 19 television stations and eight radio stations in Washington, Oregon, Idaho, and Montana, including KATU-TV in Portland, Oregon.

(12)   On January 1, 2008, taxpayer acquired two television stations in Bakersfield, California.

(13)   On December 31, 2008, taxpayer owned and operated 21 television stations and eight radio stations in Washington, Oregon, California, Idaho, and Montana.

(14)   Before and during the audit period, parent and taxpayer were engaged in a unitary business that included television and radio broadcasting, filing consolidated Oregon corporation excise tax returns as a unitary group from 1999 to 2008.

(15)   Taxpayer continued its television and radio broadcasting business following the audit period.

(16)   Safeco Corporation (Safeco) was a corporation organized under the laws of the state of Washington in 1923.

(17)   Safeco engaged in the property and casualty insurance business directly or through subsidiaries from 1923 through 2008.

(18)   On April 23, 2008, Safeco entered into a merger agreement with Liberty Mutual Insurance Company (Liberty Mutual). Under the merger agreement, each outstanding share of Safeco stock was to be, and was, cancelled as of the closing date in exchange for $68.25 in cash. The merger closed on September 22, 2008.

(19)   Safeco was publically traded on the New York Stock Exchange throughout the audit period until September 22, 2008.

(20)   During the period 2003 through December 2007, taxpayer owned 3,002,376 shares of Safeco stock.

Taxpayer's Safeco stock represented between 2.2 percent and 2.9 percent of outstanding shares of Safeco.

(21)　Taxpayer acquired its Safeco stock in 1923.

(22)　In December 2007, taxpayer sold 699,700 shares of Safeco stock at an average price of $58.05 per share, resulting in pre-tax proceeds of approximately $40.6 million. Taxpayer's gain on the sale of Safeco stock for tax purposes was approximately $32.6 million. Following this sale, taxpayer owned 2,302,676 shares of Safeco stock.

(23)　In January 2008, taxpayer used the net proceeds from its December 2007 sale of Safeco stock to fund its purchase of two television stations in Bakersfield, California. Taxpayer purchased the stations for approximately $55.3 million.

(24)　In June and July 2008, taxpayer sold its remaining shares of Safeco stock at an average price of $66.65 per share, resulting in pre-tax proceeds of approximately $153.4 million. taxpayer's gain on the sale of Safeco stock for tax purposes was approximately $127.1 million.

(25)　For financial reporting purposes, taxpayer's working capital at the end of each year in the audit period was approximately:

| | |
|------|-------------|
| 2003 | $23,219,000 |
| 2004 | $33,181,000 |
| 2005 | $35,562,000 |
| 2006 | $30,373,000 |
| 2007 | $18,048,000 |
| 2008 | $104,905,000 |

(26)　For financial reporting purposes, taxpayer's Safeco stock was not treated as a current asset under Generally Accepted Accounting Principles (GAAP) and was not part of its working capital. Taxpayer's Safeco stock was treated on its balance sheet as available-for-sale marketable securities under GAAP.

(27) From 2002 to 2008, taxpayer's dividends from Safeco were commingled with other funds, and those commingled funds were used to pay expenses, including expenses of taxpayer's broadcasting business.

(28) On its original Oregon corporation excise tax returns from tax year 1999 through tax year 2008, taxpayer reported as business income the dividends it received from Safeco Corporation.

(29) On its original Oregon corporation excise tax returns for 2007 and 2008, taxpayer classified the gain from the sale of Safeco stock in 2007 and the sales of the remaining Safeco stock in 2008 as nonbusiness income. Taxpayer subsequently filed amended returns for 2006, 2007, and 2008 reclassifying the dividends taxpayer received from Safeco as nonbusiness income.

(30) In March 2002, taxpayer entered into a Prepaid Variable Forward Sale Transaction with a participating equity collar based on the per-share price of the Safeco stock, which collateralized 3 million shares of taxpayer's Safeco stock (the Forward). Taxpayer used the proceeds of the Forward to repay debt, finance construction of Fisher Plaza (future site of taxpayer headquarters and taxpayer's Seattle television station, KOMO), and for general corporate purposes. Under the terms of the Forward, taxpayer continued to receive dividends paid on the Safeco stock, but any increases of the dividend amounts above the rate at the time of the Forward transaction would be payable to the financial institution on the Forward.

(31) Taxpayer terminated the first tranche of the Forward on April 28, 2004.

(32) In September 2004, taxpayer completed the placement of $150 million of senior notes due in 2014 (the Notes) and a six-year, $20 million revolving credit facility (the Revolver). Taxpayer used the proceeds from the Notes in part to terminate the remaining tranches of the Forward on November 4, 2004.

(33) Taxpayer's Safeco stock was not pledged as security for the Notes or the Revolver. The indenture for the

Notes and the Credit Agreement for the Revolver placed certain restrictions on taxpayer's ability to use its Safeco stock and on taxpayer's use of the proceeds from any sale of the Safeco stock. The Notes and Revolver remained outstanding and subject to those restrictions when taxpayer sold its Safeco stock in 2007 and 2008.

(34)   The indenture for the Notes remained outstanding during 2009.

Certain provisions contained in the stipulated exhibits will be discussed where relevant in the analysis of the court.

### III.   ISSUES

There are two issues for decision in this case:

(1)   Is apportioned taxation by Oregon of the gain on the disposition of the Safeco stock consistent with Oregon law and the limitations on state taxation found in the Constitution of the United States?

(2)   Is taxpayer liable for payment of a penalty under ORS 314.402?

### IV.   ANALYSIS

A.   *Statutory vs. Constitutional Analysis*

At the hearing on this matter, counsel for both parties acknowledged that there was no separation of the issues of statutory construction and federal constitutional limitations on the power of Oregon to subject the income in question to tax.

To the extent taxpayer argues that prior Oregon cases inform the decision, that argument is congruent with those prior cases tracing the constitutional limits applicable in cases such as this. Accordingly, what taxpayer argues is that the gain in question is not business income under ORS 314.610(1), or if it is, that conclusion causes the Oregon statutes to be in violation of the principles of the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States, or the Commerce Clause of Article I, section 8, clause 3, of that Constitution. The department argues to the contrary.

The court need not pause long on the statutory question. Under ORS 314.610(1) and the interpretive rules promulgated by the department, income is business income subject to apportionment if it is so categorized under either a transactional test or a functional test.[2] *Willamette Industries, Inc. v. Dept. of Rev.*, 331 Or 311, 316, 15 P3d 18 (2000). In this case, for the same reasons that are discussed below as to federal constitutional limitations, the gain on the sale of Safeco stock is business income under the functional test. The congruity of the statutory and constitutional tests can be seen in the language of the department's rules under OAR 150-314.610(1)(A)(5)(c), which states:

> "Under the functional test, income from intangible property is business income when the intangible property serves an operational function as opposed to solely an investment function. The relevant inquiry focuses on whether the property is or was held in furtherance of the taxpayer's trade or business, that is, on the objective characteristics of the intangible property's use or acquisition and its relation to the taxpayer and the taxpayer's activities. The functional test is not satisfied where the holding of the property is limited to solely an investment function as is the case where the holding of the property is limited to mere financial betterment of the taxpayer in general."

As will be discussed below, that statement is essentially the constitutional test set out in *Allied-Signal v. Director, Tax. Div.*, 504 US 768, 783, 112 S Ct 2251, 119 L Ed 2d 533 (1992). Taxpayer does not assert that the department's rule is an improper interpretation of the governing Oregon statutes.

B.  *Constitutional Analysis*

The Supreme Court of the United States has observed that the linchpin of apportionability is the unitary business principle. *Allied-Signal*, 504 US at 783.

This court's apportionability analysis begins with the observation that the television and radio business of taxpayer, operated in Oregon and other states, is conceded

---

[2] Where noted, the court's references to the Oregon Revised Statutes (ORS) are from 2003 through 2007.

by taxpayer to be a unitary business. The question is not the relationship of the media business in Washington, the domiciliary state of taxpayer, to media operations conducted in Oregon.

Rather, the question in this case is the relationship of the Safeco stock owned by taxpayer during the periods at issue to that multi-state media business. If the relationship is unitary, Oregon, a non-domiciliary state, both purports to and may tax the gain recognized by taxpayer, on an apportioned basis.

A unitary relationship between an operating business (here the media business) and an intangible interest in a discrete business (here the insurance business of Safeco) exists when the ownership of the asset serves an operational function rather than an investment function. *Allied-Signal*, 504 US at 787 (citing *Container Corp. of America v. Franchise Tax Bd.*, 463 US 159, 180 n 19, 103 S Ct 2933, 77 L Ed 2d 545 (1983)).[3] The business or enterprise of the taxpayer need not be unitary with the business or enterprise, an interest in which is represented by the intangible asset.[4] *Id.*

As is often the case, analysis may most helpfully proceed by eliminating the matters that are not at issue or the rules that either do not apply to the analysis or are not relied upon in the analysis. Here, the court recognizes that the Safeco stock may *not* be considered to have an operational function for taxpayer simply because:

---

[3] *Allied-Signal* is not the latest treatment of the unitary business principle by the Court. That description belongs to *MeadWestvaco Corp. ex rel. Mead Corp. v. Ill. Dept. of Rev.*, 553 US 16, 128 S Ct 1498, 170 L Ed 2d 404 (2008). However, the *MeadWestvaco* case did not involve a question as to the relationship between a taxpayer and an asset. *Id.* at 30. It involved the issue of the unitary relationship, *vel non*, of two enterprises. *Id.* The Court admonished the lower court that application of the *Allied-Signal* test for unitary relationship between an enterprise and an asset should not be employed in the case of a question of the relationship of two enterprises. *Id. MeadWestvaco* has therefore, little, if any, relevance to this decision.

[4] The author of a treatise often cited by the U.S. Supreme Court has stated that a unitary relationship between two businesses or enterprises may be described as "enterprise unity." Jerome R. Hellerstein & Walter Hellerstein, 1 *State Taxation* ¶ 8.08[2][f][ii], 8-126 (3d ed 2000 & 2014 Supp). However, a unitary relationship between a business and an asset, such as a minority interest in shares in another corporation, may be referred to as "asset unity." *Id.* at 8-126 to 8-127. Of course such descriptions are a helpful shorthand way of expressing relationships rather than terms of constitutional dimension.

(1)   It increases the general net worth of taxpayer or thereby increases the general creditworthiness of the taxpayer. *ASARCO Inc. v. Idaho State Tax Comm'n*, 458 US 307, 328, 102 S Ct 3103, 73 L Ed 2d 787 (1982); *F. W. Woolworth Co. v. Taxation & Rev. Dept.*, 458 US 354, 363, 102 S Ct 3128, 73 L Ed 2d 819 (1982).

(2)   It was acquired for a business purpose. *ASARCO*, 458 US at 326.

(3)   The income from the asset is commingled with the general corporate funds of the taxpayer. *F. W. Woolworth*, 458 US at 364 n 11.

(4)   The asset is held for future use or proceeds from the sale of the asset are deployed after the sale in the business of the taxpayer. *Allied-Signal*, 504 US at 789-90; *cf. Dept. of Rev. v. Terrace Tower U.S.A., Inc.*, 15 OTR 168, 174 (2000); Jerome R. Hellerstein & Walter Hellerstein, 1 *State Taxation* ¶ 8.08[2][e][vi], 8-120 to 8-123 (3d ed 2000 & 2014 Supp).

The foregoing notwithstanding, courts have recognized that intangible assets may be employed in connection with a business in such a way that their function is operational. In such cases, the income or gain from the asset is within the scope of Oregon statutes on apportionment and taxation of that gain does not violate federal constitutional limitations.

Intangible assets held as investments of necessary working capital have an operational function and the income from the investments is apportionable business income. *Allied-Signal*, 504 US at 787; *cf. Sperry & Hutchinson v. Dept. of Rev.*, 270 Or 329, 332-33, 527 P2d 729 (1974). Assets referred to as *Corn Products* assets are also examples of assets having an operational rather than investment function.[5]

Although the United States Supreme Court has not had occasion to decide the matter directly, language in *Allied-Signal* and *ASARCO*, and the views of a leading

---

[5] *Corn Products* assets are similar to those at issue in *Corn Products Co. v. Commissioner,* 350 US 46, 76 S Ct 20, 100 L Ed 29 (1955). There the assets in question were futures contracts. *Id.* at 47. The Court recognized that the purchase of such contracts was done to hedge against price fluctuations for raw materials used in the manufacturing business. *Id.* at 50.

commentator all support a conclusion that the pledge of an intangible asset is the employment of that asset in an operational function of a business. That is so where the pledge is made in connection with obtaining financing for the unitary business operations of the taxpayer.

In *Container Corp. of America v. Franchise Tax Bd.*, 463 US 159, 179-80, 180 n 19, 103 S Ct 2933, 77 L Ed 2d 545 (1983), the Court found that a parent corporation's guarantees of its subsidiaries' debt was a permissible factor for a state court to conclude it demonstrated the requisite flow of value to find the entities part of the same unitary business. A pledge appears to this court to in effect involve a similar analysis but in reverse, where a pledge of stock results in a flow of value from the stock to the business of the pledgor, at least where, as here, borrowed funds are used in the business of the pledgor.

In *Allied-Signal*, the Court, in concluding that the asset in question did not have an operational function for the taxpayer, noted that the asset had not been pledged as security for repayment of a debt. *Allied-Signal*, 504 US at 775 (quoting stipulation). Presumably, any such pledge would have had relevance only if it was done in connection with a borrowing by taxpayer with proceeds used in the business of taxpayer.

In *ASARCO*, in explaining its conclusion that the necessary unitary relationship did not exist, the Court pointed out that the assets in question had not been used as security for issuance of bonds. In footnote 21 to its opinion, the majority noted that the record indicated the taxpayer there had never used the intangible ownership interest at issue for borrowing of working capital or to support any bond issues. *ASARCO*, 458 US at 324 n 21. *ASARCO* contains a clear indication that use of an asset to secure bond financing would support a finding that the asset had been employed in an operational function. Here, as will be discussed, the Safeco stock was used to obtain financing through the issuance of the Notes.

A leading commentator, often cited by the U.S. Supreme Court in this field, has concluded that the use of an

intangible to secure a loan for essential operations would be no less operationally connected to a business than the use of other assets, such as *Corn Products* hedging assets, which fit comfortably within the operational-function concept. Hellerstein & Hellerstein, 1 *State Taxation* ¶ 8.08[2][f][iii], at 8-129. Indeed, this commentator, Hellerstein, has stated that stock pledged to secure financing for essential operations of a business would be an asset used in a business.

Hellerstein made his statements in the context of a discussion of *MeadWestvaco*. However, his comments were not limited to that particular taxpayer and the force of his conclusion can be seen in the following quote, read within the context that "the unitary business" could be a reference to the unitary business of taxpayer here, the television and radio operations in the western states:

> "Indeed, the stock could reflect an underlying investment in a yak farm in Outer Mongolia, and it would still be an asset used in the unitary business if employed to secure essential financing."

Hellerstein & Hellerstein, 1 *State Taxation* ¶ 8.08[2][f][iii], at 8-130.

In the years prior to the sale of the Safeco stock that gave rise to the gain that is the subject of this case, taxpayer engaged in two separate financing transactions. The first was the Forward. The second was borrowing under the indenture for the Notes. On the record in this case, taxpayer does not make, and could not succeed in making, any argument that the proceeds of the financing transactions were not employed in the unitary media business conducted by taxpayer. This analysis now turns to the substance of those financing transactions to determine if they involved the use of the Safeco stock in an operational function.

## C.   *The Forward Transaction*

During the first part of the tax periods in question, specifically for the 2003 year and until November 4, 2004,[6] the Forward was used as a financing vehicle to secure funds used in taxpayer's general business. The

---

[6] Fisher terminated the first tranche of the Forward on April 28, 2004, and it terminated the remaining tranches of the Forward until November 4, 2004.

Forward "collateralized 3 million shares" of the Safeco stock. In its annual report this collateralization is described as resulting from a transaction in which taxpayer "pledged 3,000,000 shares of SAFECO Corporation stock owned by it as collateral[.]"

Under the authorities discussed above, the collateralization of the Safeco stock in connection with essential funding of taxpayer's business operations leads to the conclusion that the Safeco stock was employed in an operational function during at least 2003 and a portion of 2004. However, that period pre-dates the time of the sale of the Safeco stock by a number of years.

D.   *The Notes and the Revolver*

The Forward was replaced, as a financing vehicle for the business of taxpayer, by the Notes and the Revolver. Those financing vehicles remained in place until the time of the sale of the Safeco stock.

While it is true that no affirmative pledge of the Safeco stock was made to secure repayment of the Notes or Revolver, both the indenture for the Notes and the Credit Agreement for the Revolver placed important restrictions on the use of the Safeco stock by taxpayer and the employment of the proceeds of any sale of the Safeco stock.

Specifically, the indenture for the Notes contained what is generally referred to as a negative pledge. Section 4.12 of the indenture provided:

"The Company shall not, and shall not permit any of its Restricted Subsidiaries to, create, incur, assume or otherwise cause or suffer to exist or become effective (a) any Lien of any kind upon Safeco Corporation Stock (other than a Lien pursuant to the Forward Transaction) now owned or hereafter acquired by the Company or any of its Restricted Subsidiaries (the "Safeco Shares"); or (b) any Lien of any kind upon any of their property or assets other than the Safeco Shares (other than Permitted Liens), now owned or hereafter acquired, unless in each case of (a) or (b), all payments due under this Indenture and the Notes, or, in the case of a Restricted Subsidiary, its Guarantee of the Notes, are secured on an equal and ratable basis with the

obligations so secured until such time as such obligations are no longer secured by a Lien."

Section 6.2 of the Credit Agreement for the Revolver provided:

> "Each Credit Party hereby covenants and agrees that * * * no Credit Party shall, nor shall it permit any of its Subsidiaries to * * * [c]ontract, create, incur, assume or permit to exist any Lien with respect to any of their respective property or assets of any kind (whether real or personal, tangible or intangible), whether now owned or hereafter acquired, except for Permitted Liens; provided that under no circumstances shall the Credit Parties or their Subsidiaries contract, create, incur, assume or permit to exist and Lien on any share of Safeco Corporation Stock held by a Credit Party or any of its Subsidiaries other than Liens pursuant to the Forward Transaction. Notwithstanding the foregoing, if a Credit Party shall grant a Lien on any of its assets in violation of this Section 6.2, then it shall be deemed to have simultaneously granted an equal and ratable Lien on any such assets in favor of the Administrative Agent for the benefit of the Lenders, to the extent such a Lien has not already been granted to the Administrative Agent."

(Underscoring in original.) While it is true that a negative pledge is not technically a "pledge," the negative pledge serves many of the same purposes. *See* Carl S. Bjerre, *Secured Transactions Inside Out: Negative Pledge Covenants, Property and Perfection*, 84 Cornell L Rev 305 (1999).[7]

As Bjerre points out, there are real differences between a pledge and a negative pledge in cases where the debtor violates the covenant in a subsequent borrowing and then dissipates the proceeds of that borrowing and defaults on the original loan from the negative pledgee. *Id*. at 311-13.

However, both the actual behavior of borrowers and lenders and legal doctrines that have arisen to protect the negative pledgee render the differences between an affirmative pledge and a negative pledge to be more theoretical than

---

[7] In a negative pledge, the borrower is referred to as the debtor and the lender is referred to as the negative pledgee. *See* Bjerre, 84 Cornell L Rev at 306 n 2.

practical.[8] Bjerre concludes that the use of a negative pledge rather than an affirmative pledge, rather than being the product of substantial differences in the rights of a second lender, is almost surely a result of bargaining between the borrower and a first lender and other interactions in competitive markets with well-established practices. *Id.* at 338-43.

How then, if at all, should a negative pledge be treated any differently from an affirmative pledge in the analysis of operational as opposed to investment function?

In the analysis of investment function and operational function, four Justices of the U.S. Supreme Court and Hellerstein have concluded that certain characteristics of assets, although mentioned in the decisions, should not be given constitutional dimension. Justice O'Connor and Hellerstein conclude that whether necessary working capital is invested in short-term securities or long-term securities, the investment serves an operational function. Hellerstein & Hellerstein, 1 *State Taxation* ¶ 8.08[2][e][vi] at 8-122 (citing *Allied-Signal*, 504 US at 793 (O'Connor, J., dissenting)); *Allied-Signal*, 504 US at 793 (O'Connor, J., dissenting).

That conclusion can be logically derived from the basis of the unitary doctrine. That doctrine examines the relationship of an asset or an enterprise (being, of course, a group of assets) existing or operating outside the non-domiciliary taxing state and the business operations occurring within that taxing state. The doctrine does not look to the relationship between the owner of any given asset and the recipient of invested funds. Therefore, the redemption rights of the holder of an investment of working capital *vis-à-vis* the issuer of the investment should not be examined.[9]

---

[8] Bjerre points out that both for good business reasons and to avoid an argument that assets are subject to an equitable lien in favor of a first lender, subsequent lenders would typically both engage in due diligence investigation of existing contracts of the borrower and obtain opinions from counsel for the borrower. Such commercially reasonable activity would cause the negative pledge to be discovered and the position of the second lender would be materially weakened as it would have notice of the claim of the first lender. *See* Bjerre at 322-29.

[9] The conclusions of Justice O'Connor and Hellerstein appear to assume, however, that some market for longer-term investments would exist so that a longer-term investment would have appropriate liquidity features such that the holder could acquire needed working capital cash prior to the maturity of an investment.

Similarly, this court cannot conclude that the decision of borrowers and lenders to use negative pledge covenants rather than affirmative pledges of an asset is of constitutional significance. That choice, like the long- or short-term features of a relationship between a taxpayer and the issuer of a security into which working capital cash is invested, has nothing to do with the relationship of the asset in question to the business of the taxpayer carried on in the taxing state.

In the case of the Safeco stock, the use of an affirmative rather than a negative pledge has nothing to do with the relationship of the Safeco stock to the media business and the employment of the Safeco stock in obtaining funding for that business. The form of pledge has, instead, to do with the rights of a first lender *vis-à-vis* a subsequent lender with respect to Safeco stock in the event of a default by taxpayer on its debt obligations.

Additionally, for purposes of constitutional analysis, this court cannot assume that a borrower such as this taxpayer would violate the negative pledge covenant. Such a violation would trigger a default under the indenture for the Notes and the Credit Agreement for the Revolver and lead, almost certainly, to the acceleration of all the amounts due to the Note and Credit Agreement lenders and, failing payment in full, to the door of the bankruptcy court.

Accordingly, this court must treat the negative pledge, read together with the other covenants mentioned above and discussed below, as constitutionally equivalent to an affirmative pledge. That being so, like the investment in Hellerstein's hypothetical yak farm, the investment by taxpayer in the Safeco stock has been employed in an operational function of taxpayer's business carried on, in part, in Oregon.

At least one other covenant in the indenture for the Notes provides further support for this conclusion. Under section 4.10 of the indenture, proceeds of any sale of any assets, including the Safeco stock, must either be used to operate and expand the unitary business or support an offer to retire the Notes. The lender to taxpayer in fact required that sale proceeds could not be used for any different business. Thus, the economic value of the Safeco stock is tied to the specific

media business that operates, in part, in Oregon. The covenant in section 4.10 of the indenture is, in effect, a "use it (in your business) or lose it" provision. The value of the Safeco stock realized upon sale must either be used in the unitary business or surrendered to the Note holders.

The department pointed to the covenants in the indenture for the Notes in support of its position. Taxpayer argues that the argument of the department based on the covenants is "simply a thinly veiled rehash of the corporate purpose or betterment arguments rejected by this Court and the U.S. Supreme Court."

This court does not agree. The U.S. Supreme Court has rejected the idea that where an asset serves only to increase the net worth of an enterprise or to increase general creditworthiness, or where the asset was acquired for a business purpose, those facts alone will support a conclusion that the asset has an operational function. What is lacking in those instances is a specific functional connection between the asset in question and the business carried on in the taxing state, here Oregon.

In this case the Safeco stock was not just an asset on the balance sheet of taxpayer, serving to make taxpayer a better credit risk in general, or a better investment for its shareholders. It was instead an asset that, through the covenants in the indenture and the financing obtained through those covenants, was specifically devoted to and employed in the unitary television and radio business of taxpayer.

The Safeco stock was not just an "extra" asset. That judgment is not one made by this court. It is a judgment made by the directors and management of taxpayer. They repeatedly rebuffed any suggestion of such a characterization of the Safeco stock in refusing persistent and serious entreaties from a shareholder group to liquidate the investment and distribute the proceeds to the shareholders of taxpayer. The actions of the directors and management of taxpayer are, perhaps, the most significant indicators of the economic significance and connection of the Safeco stock to the business of taxpayer. Had the Safeco stock been employed only in an investment function, there would have been few good arguments for not acceding to the demands of the shareholder group.

E. *Penalty Issue*

Under ORS 314.402, taxpayer is responsible for payment of the penalty assessed if it did not have substantial authority for its treatment of an item on a return. In this case the item in question is the treatment of gain on the sale of Safeco stock.

It is true that taxpayer has brought forward cases that relate in a general way to the problem in this case of whether there are constitutional restraints on taxation in Oregon of such gain. However, the weakness of taxpayer's position can be seen in its description of the department case as being merely a "rehash of the corporate purpose or betterment positions" that have been rejected by the U.S. Supreme Court. The Safeco stock did not just sit idly on the balance sheet of taxpayer serving a general corporate purpose or generally increasing creditworthiness. Rather, it was consistently and actively employed by taxpayer to obtain financing for the unitary business of taxpayer. What lenders demanded, and what taxpayer gave in respect of the Safeco stock, were constitutionally strong connections between the Safeco stock and the media business.

The court is of the opinion that the position of taxpayer was not supported by substantial authority.

## V. CONCLUSION

For the reasons set forth above, the court concludes that the Safeco stock was employed by taxpayer in an operational function prior to its sale. Therefore, the gain from the sale of the Safeco stock is subject to tax in Oregon on an apportioned basis.

Additionally, taxpayer is liable for the penalty for a position taken without substantial authority. Now, therefore,

IT IS ORDERED that Defendant's Cross-Motion for Summary Judgment is granted; and

IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment is denied.