ATTORNEYS FOR PETITIONER:
**FRANCINA A. DLOUHY**
**DANIEL R. ROY**
FAEGRE BAKER DANIELS LLP
Indianapolis, IN

**HOLLIS L. HYANS**
MORRISON & FOERSTER LLP
New York, New York

ATTORNEYS FOR RESPONDENT:
**CURTIS T. HILL, JR.**
ATTORNEY GENERAL OF INDIANA
**WINSTON LIN**
DEPUTY ATTORNEY GENERAL
Indianapolis, IN

# IN THE
# INDIANA TAX COURT

| | |
|---|---|
| E.I. DUPONT DE NEMOURS and COMPANY, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Cause No. 49T10-1307-TA-00065 |
| | ) |
| INDIANA DEPARTMENT OF STATE REVENUE, | ) |
| | ) |
| Respondent. | ) |

**FILED**
Jul 11 2017, 4:22 pm
**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

## ORDER ON PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

**FOR PUBLICATION**
**July 11, 2017**

WENTWORTH, J.

E.I. DuPont De Nemours and Company ("DuPont") has appealed the Indiana Department of State Revenue's final determination assessing it with additional adjusted gross income tax (AGIT) and interest for the 2006 and 2007 tax years and a penalty for 2007. DuPont's appeal is currently before the Court on the parties' cross-motions for

summary judgment. In resolving those cross-motions, the Court grants each in part and denies each in part.

## FACTS AND PROCEDURAL HISTORY

DuPont, a Delaware corporation, was founded in 1802. (App. Pet'r Mot. Summ. J. ("Pet'r Des'g Evid."), Vol. III, Aff. of Gary M. Pfeiffer ("Pfeiffer Aff.") ¶ 3). Originally, DuPont manufactured gunpowder. (See Pet'r Br. Supp. Mot. Summ. J. ("Pet'r Br.") at 30-31.) See also Wikipedia, https://en.www.wikipedia.org/wiki/DuPont (last visited July 10, 2017). Today, however, it is engaged with its subsidiaries and affiliates in a variety of industrial, agricultural, and chemical manufacturing businesses worldwide. (Pfeiffer Aff. ¶ 3.)

### A. DuPont's Pharmaceutical Business

In 1991, DuPont and Merck & Co., Inc. formed the DuPont Merck Pharmaceutical Company ("DMPC"). (Pfeiffer Aff. ¶¶ 6-7.) DuPont and Merck each owned equal 50% interests in DMPC, which researched, developed, manufactured, and sold human pharmaceutical products, imaging agent products, and other related product lines. (Pfeiffer Aff. ¶¶ 6, 9; Pet'r Des'g Evid., Vol. I, Ex. 1 at DIN 1161.) DMPC operated independently of DuPont and Merck: it maintained its own management team, its own separate research agenda and development facilities, its own employees, its own profit objectives, and its own separate operating policies and procedures. (Pfeiffer Aff. ¶¶ 9-12; Pet'r Des'g Evid., Vol. III, Aff. of Kurt M. Landgraf ("Landgraf Aff.") ¶¶ 17-18.) While DuPont initially leased certain facilities to DMPC and provided it with some "start-up" personnel and administrative services, DuPont charged DMPC arm's-length fees for the services it rendered. (See Resp't Des'g Evid., Ex. 2G at DIN 1555-62, 1577-78.)

2

In 1998, Merck sold its 50% interest in DMPC to DuPont Pharma, Inc., a subsidiary of DuPont. (See, e.g., Pfeiffer Aff. ¶¶ 13-14, 17; Resp't Des'g Evid., Ex. 2H.) At that point, DMPC was renamed DuPont Phamaceuticals Company ("DPC"). (Pfeiffer Aff. ¶ 17.) While DPC received certain start-up services from DuPont, for which it paid arm's-length fees, it otherwise operated independently of DuPont. (Landgraf Aff. ¶ 29; Resp't Des'g Evid., Ex. 5 at 56.)

In 2001, DuPont sold DPC to Bristol-Meyers Squibb Company. (Pfeiffer Aff. ¶¶ 37, 41; Pet'r Des'g Evid., Vol. II, Ex. 9.) The sale generated a gain of over $4 billion to DuPont. (Resp't Des'g Evid., Ex. 6 at 4.)

**B. DuPont's Financing Arrangements**

In 1995, DuPont Energy Company ("DEC"), a subsidiary of Dupont through Dupont's ownership of Conoco, Inc. and its subsidiaries, loaned DuPont nearly $8 billion at an interest rate of 8.528% ("1995 Loan"). (Pet'r Des'g Evid., Vol. III, Aff. of Sharon E. Smith ("Smith Aff.") ¶ 3, Ex. 10, Aff. of Noah Schreiber ("Schreiber Aff.") ¶ 3, Aff. of Sherif Assef ("Assef Aff.") ¶ 4a; Resp't Des'g Evid., Ex. 2J.) The 1995 Loan terms did not require DuPont to make any payments on either the interest or the principal until 2005. (Resp't Des'g Evid., Ex. 2J.)

In 1998, DEC assigned the promissory note associated with the 1995 Loan to another DuPont subsidiary, DuPont Global Operations, Inc. ("DGOI"). (Smith Aff. ¶ 3; Pet'r Des'g Evid., Vol. III, Ex. 10.) In 1999, DGOI loaned DuPont $3.9 billion at an interest rate of 7.40% ("1999 Loan"). (Smith Aff. ¶ 4; Pet'r Des'g Evid., Vol. III, Ex. 11.) The 1999 Loan

3

terms did not require DuPont to make any payments on either the interest or the principal until 2009. (Pet'r Des'g Evid., Vol. III, Ex. 11.)

On August 31, 2005, the 1995 Loan came due. (Resp't Des'g Evid., Ex. 2J at DIN 2027.) That same day, DGOI loaned DuPont $12.2 billion ("2005 Loan") – which equaled the full value of the principal and the total interest due on the 1995 Loan – at an interest rate of 5.64%. (See Resp't Des'g Evid., Exs. 2L at DIN 2065, 4 at 7-8 (Petitioner's Response to Respondent's First Request for Admissions at No. 8 (indicating that because DuPont never made any payments on the 1995 Loan, the principal and accrued interest on the 1995 Loan were rolled over and became the principal balance on the 2005 Loan)).) Similar to the 1995 Loan, the 2005 Loan terms did not require DuPont to make any payments on the principal or the interest for ten years. (See Resp't Des'g Evid., Ex. 2L at DIN 2065.)

### C. Indiana Audit

For tax years 1997 through 2007, DuPont and its subsidiaries filed consolidated Indiana AGIT returns. (See Pet'r Des'g Evid., Vol. III, Ex. 16; Resp't Des'g Evid., Confd'l Ex. 2O.) In 2009, the Department audited the consolidated 2005, 2006, and 2007 returns. (See Resp't Des'g Evid., Ex. 3 ¶¶ 5-6.) As a result of the audit, the Department determined that DuPont had improperly reported 1) net operating losses ("NOLs") by characterizing the gain from the 2001 sale of DPC as nonbusiness income; 2) interest expense deductions on the loans it received from DEC and DGOI; and 3) a research and development ("R&D") expense deduction. (See Resp't Des'g Evid., Ex. 3 ¶¶ 8-20.)

4

Accordingly, the Department made the following adjustments to DuPont's consolidated returns:

1) it reclassified the gain DuPont received from the sale of DPC as apportionable business income, increasing DuPont's 2001 adjusted gross income by nearly $5 billion and reducing the amount of NOLs DuPont could carry forward to subsequent years;

2) it eliminated the interest expense deductions DuPont reported between 2005 and 2007 that were related to the 1995, 1999, and 2005 Loans, increasing DuPont's adjusted gross income in 2006 and 2007 by approximately $3 billion and further reducing DuPont's available NOLs carry forward;

3) it eliminated DuPont's 2007 R&D expense deduction, increasing DuPont's 2007 adjusted gross income by another $43 million.

(See Resp't Des'g Evid., Ex. 3 ¶¶ 9-20, Confd'l Ex. 8 at 4.)

The Department's three adjustments culminated in the issuance of Proposed Assessments against DuPont for an additional $394,490 in AGIT liability plus interest for 2006 and $376,328 plus interest for 2007. (Resp't Des'g Evid., Ex. 3 ¶¶ 21-22; Ex. 7.) The Department also assessed a $37,627 penalty against DuPont for tax year 2007. (Resp't Des'g Evid., Ex. 7 at 6.) DuPont subsequently protested the Proposed Assessments but, after conducting a hearing, the Department denied the protest in a Letter of Findings. (Resp't Des'g Evid., Confd'l Ex. 8.)

On July 26, 2013, DuPont filed an original tax appeal, claiming the Department's audit adjustments were improper. DuPont and the Department filed cross-motions for summary judgment, and the Court conducted a hearing on the motions on March 4, 2016.

## STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C).

Cross-motions for summary judgment do not alter this standard. Horseshoe Hammond, LLC v. Indiana Dep't of State Revenue, 865 N.E.2d 725, 727 (Ind. Tax Ct. 2007), review denied.

## ISSUES

The parties' cross-motions for summary judgment present the following questions for the Court's resolution:

I. Did the Department have the authority to make adjustments to DuPont's NOLs in years that were closed to assessment under the applicable statute of limitations?

II. Did the Department err when it reclassified DuPont's gain on its 2001 sale of DPC from nonbusiness income to business income?

III. Did the Department err when it disallowed the interest expense deductions DuPont reported on its 2006 and 2007 returns on the basis that the underlying loans were sham transactions?

IV. Did the Department err when it disallowed DuPont's 2007 R&D expense deduction?

V. Did the Department err when it imposed a penalty for 2007?

(Compare Pet'r Br. at 14, 20, 33, 41, 44 with Resp't Br. Opp'n Pet'r Mot. Summ. J. & Supp. Resp't Cross-Mot. Summ. J. ("Resp't Br.") at 2.)

## ANALYSIS AND ORDER

### I.    Retroactive Adustments

The Department's Proposed Assessments against DuPont were partly the result of reductions it made to the NOLs DuPont reported on its pre-2005 tax returns that resulted in lower NOL carry forwards that DuPont could deduct on its 2006 and 2007 returns. See supra, pp. 4-5. DuPont gives two primary reasons why the Department's retroactive adjustments are improper. First, it claims that Indiana Code § 6-8.1-5-2 prohibited the

6

Department from making adjustments to the pre-2005 tax years because those tax years were "closed," i.e., outside the statute of limitations. (See, e.g., Pet'r Br. at 1-2, 14-15, 18.) Second, DuPont asserts that strong policy reasons auger against allowing the Department to make the adjustments it did. (See Pet'r Br. at 15 (claiming that adjustments like the ones at issue disrupt settled expectations, create uncertainty for taxpayers, and increase the costs of preserving evidence).) The Court is not persuaded by DuPont's reasoning, however, for the following four reasons.

First, the Department's audit reviewed DuPont's 2005 through 2007 returns for accuracy. See, e.g., IND. CODE §§ 6-8.1-1-1, -2-1 (2009) (providing that the Department is charged with the administration, collection, and enforcement of the AGIT); IND. CODE §§ 6-8.1-3-1, -3-12(a) (2009) (explaining that to accomplish its charge, the Department has broad powers that include audit and investigatory powers). Accordingly, the accuracy of the NOL deductions DuPont reported in 2005, 2006, and 2007 was contingent upon the accuracy of its initial NOL calculation in 2001, the year the NOL was actually incurred and therefore could be carried forward for a period of up to 20 years. See, e.g., IND. CODE § 6-3-2-2.6 (2006) (amended 2010); I.R.C. § 172(b) (2006); Subaru-Isuzu Automotive, Inc. v. Indiana Dep't of State Revenue, 782 N.E.2d 1071, 1076-77 (Ind. Tax Ct. 2003). As a result, it was incumbent upon the Department to examine and perhaps even recalculate the NOL DuPont reported in 2001. See, e.g., Hillenga v. Dep't of Revenue, 361 P.3d 598, 603, 606 (Or. 2015) (concluding that "[a] taxpayer who seeks to apply a carryover from a closed year against the income from an open one actively puts the carryover from the closed year in issue").

7

Second, Indiana Code § 6-8.1-5-2(a) prohibits the Department from issuing a proposed assessment to a taxpayer more than 3 years after the date its return is filed or due, whichever is later. IND. CODE § 6-8.1-5-2(a)(1) (2006) (amended 2009). The statute is silent regarding whether adjustments may be made to tax returns outside that time frame. See I.C. § 6-8.1-5-2(a)(1). Because Indiana Code § 6-8.1-5-2(a) sets time limits on assessments only, its plain language does not support DuPont's claim that the Department was prohibited from adjusting the NOLs DuPont reported prior to 2005. See, e.g., SAC Fin., Inc. v. Indiana Dep't of State Revenue, 24 N.E.3d 541, 547 (Ind. Tax Ct. 2014) (explaining that because the Legislature intentionally chooses its language, the Court will not expand or contract the meaning of a statute by reading language into it that is not there), review denied; Scopelite v. Indiana Dep't of Local Gov't Fin., 939 N.E.2d 1138, 1143 (Ind. Tax Ct. 2010) (explaining that it is equally as important to recognize what statutes do not say as it is to recognize what they do say).

Third, DuPont has not directed the Court to any authority that precludes the Department from making adjustments to "closed" years. (See Pet'r Br. at 14-20.) In fact, DuPont admits that it is not aware of any statutory provision or case law that prohibits the type of adjustments the Department made in this case. (See Hr'g Tr. at 49-50.)

Finally, the policy against retroactive taxes that promotes certainty and preserves settled expectations is not implicated here. Even though the Department may correct an error in a "closed" year, it cannot assess additional tax beyond the express statutory time limit. See I.C. § 6-8.1-5-2(a). Thus, DuPont has received the "closure and certainty" to which it is entitled. Indeed, while

> [a] taxpayer cannot . . . claim [a] carryover while precluding any review
> of its merit . . . claiming a net loss carryover from a closed tax year does

8

not open that tax year for purposes of assessing a deficiency. . . .[T]he calculation of the carryover credit from the closed year [may be revisited] only for the purpose of determining the tax liability for the open year.

Hillenga, 361 P.3d at 606. Moreover, the lament that it may be costly to preserve records and documentation to substantiate an NOL for a period of up to 20 years is unavailing because DuPont placed itself in this position intentionally when it chose to deduct the 2001 NOL in the first place. Therefore, DuPont has not persuaded the Court that the Department's retroactive NOL adjustments – without accompanying assessments – were improper.[1]

## II. Apportionable Business Income

DuPont contends that even if the Department had the authority to adjust its NOL deductions in closed years, it improperly reclassified DuPont's gain from the 2001 sale of DPC from nonbusiness income to business income. Indiana Code § 6-3-1-20 defines "business income" as "income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitutes integral

---

[1] DuPont has also argued that the Department's retroactive adjustments violate its equal protection and due process rights. (See Pet'r Br. Supp. Mot. Summ. J. ("Pet'r Br.") at 19-20.) DuPont has done very little to develop this argument other than assert that the adjustments result in the disparate treatment between taxpayers that claim NOLs and taxpayers that do not. (See Pet'r Br. at 19-20). Accordingly, the Court will not address DuPont's argument. See U.S. Fid. & Guar. Ins. Co. v. Hartson-Kentucky Cabinet Top Co., 857 N.E.2d 1033, 1038 (Ind. Ct. App. 2006) (stating that where a party presented no cogent argument to support its assertion, the assertion was waived).

parts of the taxpayer's regular trade or business operations."[2]  IND. CODE § 6-3-1-20

(2001).  "Nonbusiness income" is defined as "all income other than business income."  IND.

CODE § 6-3-1-21 (2001).  The distinction between business and nonbusiness income is

important when calculating a company's Indiana AGIT liability because business income is

apportioned between Indiana and the other states in which the company does business,

but nonbusiness income is allocated to just one state.  See May Dep't Stores Co. v.

Indiana Dep't of State Revenue, 749 N.E.2d 651, 656 (Ind. Tax Ct. 2001) (citing IND. CODE

§ 6-3-2-2).

To determine whether a taxpayer's income is business income, the Court applies

two tests.  See id. at 662-63.  The first is the transactional test, which arises from the first

part of Indiana's statutory definition of business income, i.e., that business income "'means

income arising from transactions and activity in the regular course of a taxpayer's trade or

business[.]'"  Id. at 658 (quoting I.C. § 6-3-1-20).  Under this test, "the 'controlling factor by

which business income is identified is the nature of the particular transaction giving rise to

the income.'"  Id. (citation omitted).  Accordingly, the Court may consider, among other

things: "(1) the frequency and regularity of similar transactions; (2) the former practices of

the business; and (3) the taxpayer's subsequent use of the income."  Id. at 659 (citations

omitted).

DuPont's gain is business income under the transactional test if the sale of DPC

occurred in the regular course of DuPont's trade or business.  See May, 749 N.E.2d at

---

[2] Indiana has not adopted the Uniform Division of Income for Tax Purposes Act (UDITPA), but it uses the identical language to define business income that is found in UDITPA.  Compare IND. CODE § 6-3-1-20 (2001) with Jerome R. Hellerstein & Walter Hellerstein, State Taxation, Table 9-1 (listing states that have adopted UDITPA), ¶ 9.05[1] (3d ed. 1998 & Supp. 2015).  (See also Pet'r Br. at 29 n.5.)

659. The Department asserts that DuPont's gain was received in the regular course of its trade or business of buying and selling companies. (Resp't Br. at 16.) As evidence, the Department refers to DuPont's IRS Form 851 Affiliation Schedules that indicate how many subsidiaries DuPont owned between 1997 and 2001. (See Resp't Br. at 16 (citing Resp't Des'g Evid., Confd'l Ex. 2M, Ex. 5 at 7-8).) The Department also states that "the buying and selling of companies was so fundamental to . . . DuPont, it was included in [its] articles of incorporation." (See Resp't Br. at 16 (citing Resp't Des'g Evid., Ex. 2A at DIN 423).)

When reviewing a motion for summary judgment, the Court construes all properly asserted facts and reasonable inferences drawn therefrom in favor of the non-moving party. See Scott Oil Co. v. Indiana Dep't of State Revenue, 584 N.E.2d 1127, 1128-29 (Ind. Tax Ct. 1992). In its motion, the Department asks the Court to infer that DuPont's regular trade or business is buying and selling other businesses merely because the number of subsidiaries it owned "fluctuated annually" and because its articles of incorporation stated that it may purchase, sell, develop, and operate "lands and buildings." (See Resp't Br. at 16; Resp't Des'g Evid., Ex. 2A at DIN 423(d).) This inference is not reasonable in light of the fact that other evidence designated by both DuPont and the Department demonstrates that DuPont is in the regular business of industrial, agricultural, and chemical manufacturing. (See Pfeiffer Aff. ¶ 3; Pet'r Des'g Evid., Vol. III, Ex. 17; Pet'r Des'g Evid., Vol. IV, Pelsor Tr. at 22, Fretts Tr. at 24.) (See also Resp't Des'g Evid., Confd'l Ex. 8 at 4.)

The designated evidence supports the reasonable inference that DuPont's manufacturing was its regular trade or business while its sale of any subsidiaries generally, and DPC specifically, was not. (See, e.g., Resp't Des'g Evid., Ex. 2A at DIN 422-23(a)-

11

(c).)  See also WEBSTER'S THIRD NEW INT'L DICTIONARY 2279 (2002 ed.) (defining a "subsidiary" as a corporation that "function[s] in the provision of aid, support, or other benefit usu[ally] in a subordinate or inferior status or capacity").  As a result, the Court finds that under the transactional test, DuPont's gain was not business income.

The second test used to determine whether income is business income is the functional test, which comes from the second part of Indiana's statutory business income definition, i.e., that business income "'includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitutes integral parts of the taxpayer's regular trade or business operations.'" May, 749 N.E.2d at 659 (citation omitted).  Under this test, the gain received from the disposition of a capital asset is business income if the asset was acquired, managed, and disposed of by the taxpayer in its regular trade or business operations; the extraordinary nature or infrequency of the sale is irrelevant.  Id. at 659-60 (citations omitted).

DuPont's gain is business income under the functional test if DuPont's acquisition, management, and disposal of DPC was integral (i.e., necessary or essential) to its manufacturing operations.  See id. at 664.  The Department claims the designated evidence shows that:

1) DuPont bought Merck's interest in DMPC and formed DPC to enhance its competitiveness in the pharmaceutical sector, which it viewed as critical to its success;

2) DuPont's public filings indicated that both DPC and phamaceuticals were integral to its business; and

3) DuPont sold DPC in response to changing market conditions, using the proceeds to enhance its profitability by buying back stock and paying down debt.

(Resp't Br. at 16 (citing Pfeiffer Aff. ¶¶ 14-16; Resp't Des'g Evid., Ex. 1 ("1998") at 3, 18; Ex. 1 ("1999") at 3, 5; Ex. 3 ¶ 19; Ex. 5 at 101, 104-05).) Accordingly, the Department concludes that "[t]hroughout its entire existence, including through its sale, DPC was an integral piece of DuPont's business." (Resp't Br. at 16.)

Even if it was reasonable to infer that DuPont both acquired and disposed of DPC as an integral part of its manufacturing business, DuPont must also have managed DPC as an integral part of its manufacturing business in order to characterize the gain as business income. See May, 749 N.E.2d at 664 (emphasizing that all three factors – the acquisition, the management, and the disposition of the property – must be met in order for the functional test to be satisified). As previously indicated, however, the designated evidence shows that DuPont played no role in the management of DPC; rather, DPC operated as an independent, autonomous business. (See, e.g., Landgraf Aff. ¶ 29; Resp't Des'g Evid., Ex. 5 at 56-58.) Indeed, like its predecessor DMPC, DPC maintained its own management team, its own research agenda and development facilities, its own employees, its own profit objectives, and its own operating policies and procedures. (Compare Pfeiffer Aff. ¶¶ 9-12 and Landgraf Aff. ¶¶ 17-18 with Landgraf Aff. ¶ 29 and Resp't Des'g Evid., Ex. 5 at 56-58.) Consequently, the gain from the sale of DPC does not qualify as business income under the functional test either.

The Court's conclusion that DuPont's gain is not apportionable business income under Indiana Code § 6-3-1-20 is compatible with the result when applying the United States Constitution's unitary business principle standard. See, e.g., Allied-Signal, Inc. v. Dir., Div. of Taxation, 504 U.S. 768, 786 (1992) (stating that the definitions of "business income" and "non-business income" contained in UDITPA are "compatible" with the unitary

13

business principle); supra, n.2 (explaining that the definitions of business and non-business income under UDITPA and Indiana Code §§ 6-3-1-20 and -21 are the same). The unitary business principle provides that a state "'may tax an apportioned sum of [a] corporation's multistate business if the business is unitary.'" MeadWestvaco Corp. v. Illinois Dep't of Revenue, 533 U.S. 16, 25 (2008) (citations omitted). A unitary business relationship exists when corporate entities like DuPont and DPC are functionally integrated, centrally managed, and benefit from economies of scale. See Allied-Signal, 504 U.S. at 781. See also Container Corp. of Am. v. Franchise Tax Bd., 463 U.S. 159, 180 n.19 (1983) (explaining that "a flow of value" serving an operational, rather than investment, function is evidence of "functional integration," while the presence of arm's-length transactions between two entities demonstrates a lack of integration, and that the "occasional oversight . . . that any parent gives to an investment in a subsidiary" is not evidence of centralized management); Exxon Corp. v. Wisconsin Dep't of Revenue, 447 U.S. 207, 224 (1980) (explaining that economies of scale are present when business entities share a centralized purchasing office "whose obvious purpose [is] to increase overall corporate profits through bulk purchases and efficient allocation of supplies").

Here, the designated evidence does not show that DuPont and DPC were unitary. First, but for some initial (i.e., "start-up") flow of value between DuPont and DPC, DPC operated independently of DuPont, and it paid DuPont arm's-length rates for all services it was provided. (Pet'r Des'g Evid., Vol. I., Aff. of Carmen Giannantonio ("Giannantonio Aff.") ¶¶ 8-9, 39, 44-45, 47, Landgraf Aff. ¶ 29; Resp't Des'g Evid., Ex. 5 at 56.) Second, there is uncontradicted evidence that DuPont exercised no more than the "occasional oversight" over DPC than would be typically afforded to an investor over his investment. (Compare

14

Giannantonio Aff. ¶¶ 37, 54 and Pfeiffer Aff. ¶ 23 with Resp't Br. at 17 (claiming that there was centralized management merely because DuPont owned DPC).) Finally, there were no economies of scale. (See Pfeiffer Aff. ¶ 26; Giannantonio Aff. ¶ 48 (explaining that DuPont and DPC did not share any centralized purchasing whatsoever).) Because DuPont and DPC are not unitary, the unitary business principle directs that DuPont's gain on its sale of DPC is not apportionable business income.

### III. Intercompany Interest Deductions

The next issue is whether the Department erred when it disallowed the nearly $3.1 billion in interest expense deductions DuPont claimed on its 2006 and 2007 returns. (See, e.g., Resp't Des'g Evid., Ex. 3 ¶¶ 13, 17.) The Department disallowed the deductions on the basis that the underlying loans lacked economic substance and were therefore sham transactions. (See, e.g., Resp't Br. at 7.)

This Court has previously applied the federal economic substance doctrine to determine whether a taxpayer's transactions lack economic substance. See, e.g., Elmer v. Indiana Dep't of State Revenue, 42 N.E.3d 185, 191 (Ind. Tax Ct. 2015). Under this doctrine, "[t]he determination of whether a taxpayer's transactions lacks economic substance . . . requires the application of a two-pronged test: (1) was the taxpayer motivated by any business purpose other than obtaining a tax benefit (the business purpose test); and (2) did the transactions lack economic substance because no reasonable possibility of a profit existed (the economic substance test)." Id. (citing Rice's Toyota World, Inc. v. C.I.R., 752 F.2d 89, 91 (4th Cir. 1985)). Here, the Department claims that there can be neither a legitimate business purpose nor economic substance to a loan

15

which is never repaid and whose sole effect was to "wipe out" DuPont's Indiana income through the interest expense deductions. (Resp't Br. at 9.)

## A. Business Purpose

The Department has merely alleged that Dupont's loan transactions were used solely to obtain the tax benefit associated with eliminating all of its Indiana taxable income. (See Resp't Br. at 9.) In response, however, DuPont designated evidence that its transactions with DEC and DGOI were part of a broader restructuring plan designed to raise additional capital through a public stock offering. (See Schreiber Aff. ¶¶ 4-5; Pet'r Des'g Evid., Vol. III., Exs. 13, 14).

## B. Economic Substance

Next, the Department recites a litany of particulars to support its position that Dupont's loan transactions should be disregarded because they were structured without a profit motive. More specifically, the Department argues that it properly disregarded the loan transactions that lacked economic substance because: 1) DGOI had no receipts, sales, or income by which it could have made its multi-billion dollar loans to DuPont; 2) DuPont never made any payments on the Loans; and 3) the interest rates on the Loans were "too high." (See Resp't Br. at 7-8, 11-13.) Moreover, the Department contends that under Indiana Code §§ 6-3-2-2 and -20, it has the authority to "modify or disregard" the transactions to reach their "true" economic substance. (See Resp't Br. at 8; Pet'r Br. at 38 (citing Pet'r Des'g Evid., Vol. IV, Pelsor Tr. at 94-95, 97).) For the following reasons, the Court disagrees.

16

First, the Department questions how DGOI could have made its multi-billion dollar loans when it had no receipts, sales, or source of taxable income of its own beyond the interest payments it received from its Loans.[3] (See Resp't Br. at 3, 8.) As Dupont has explained, however, the original lender of the 1995 Loan was DEC, not DGOI. (See Pet'r Br. Opp'n Resp't Mot. Summ. J. & Reply Supp. Mot. Summ. J. ("Pet'r Reply Br.") at 15.) Dupont's designated evidence shows that DEC had capital from its receipt of dividends from the companies it owned, including Conoco, by which to make its loans. (See Schreiber Aff. ¶ 3.) DuPont's designated evidence also shows that not only did DGOI receive a capital contribution of nearly $19 billion prior to making the 1999 Loan, but it had sufficient cash flow after it made the 1999 Loan because Conoco paid DGOI more than $4 billion in principal and interest on other outstanding intercompany loans. (See Aff. of Noah Schrieber Supp. Pet'r Opp'n Resp't Mot. Summ. J. ¶¶ 3-5, Ex. 1 (filed Dec. 16, 2015).) Thus, both DEC and DGOI were amply funded and able to loan money to DuPont.

Second, the Department claims that the Loans lacked economic substance because DuPont never made any interest or principal payments on them, merely rolling over the outstanding liabilities on the maturity dates into new loans. (See Res'p Br. at 8-9.) Nonetheless, both Dupont's and the Department's designated evidence show that, consistent with market practices, DuPont accrued the interest expense on its financial statements and DGOI accrued the interest income. (See Assef Aff. ¶ 12; Resp't Des'g

---

[3] The Department also states that DGOI paid no wages and thus had no employees. (See Resp't Br. at 3.) Dupont's designated evidence and related argument demonstrate, however, that during the years at issue DGOI had one employee. (See Pet'r Br. at 8 (citing Pet'r Des'g Evid., Vol. III, Aff. of Sharon E. Smith ¶ 6).) To the extent the Department may have desired the Court to draw an inference from the number of employees DGOI had, it failed to provide any cogent argument and cite to any supporting evidence to that effect. (See Resp't Br. at 7-13.)

Evid., Ex. 3 ¶ 15, Ex. 4 (Petitioner's Response to Respondent's First Request for Admissions at No. 8), Confd'l Ex. 8 at 8.)  Accruals, for purposes of financial reporting, are treated as if actual cash has been exchanged.  See, e.g., BLACK'S LAW DICTIONARY 22 (9th ed.) (defining "accounting method" as "[a] system for determining income and expenses, profit and loss, asset value, appreciation and depreciation, and the like, esp. for tax purposes"; defining "accrual accounting method" as "[a]n account method that records entries of debits and credits when the revenue or liability arises, rather than when the income is received or an expense is paid").  As a result, the Department has "cried wolf" by implying that interest payments that exist merely as book entries, without money changing hands, have no economic substance.

Third, the Department maintains that the interest rates on the Loans were "too high" and should have been refinanced.  (See Resp't Br. at 4, 12.)  Nonetheless, DuPont's "common business practice [was] to ensure that all intercompany loans were made on an arm's[-]length basis, at market rates comparable to those that would have been available from outside lenders."  (Pfeiffer Aff. ¶ 42.)  To that end, the interest rates on the Loans were established within the "safe haven range" prescribed by § 482 of the Internal Revenue Code.  (Assef Aff. ¶¶ 5-9, Ex. C (indicating that with respect to transactions between related parties (e.g., intercompany transactions), I.R.C. § 482 indicates that an interest rate within the safe haven range (i.e., between 100% and 130% of the applicable federal rate ("AFR")) is considered to be "arm's-length" and thus at a market rate).)  Moreover, DuPont's designated evidence shows not only that DuPont was not required to refinance its Loans during their terms, but also that it most likely would not have been able

to refinance at rates lower than those already applied to the Loans. (Assef Aff. ¶¶ 14-27, 29.)

To the extent the Department has claimed that Indiana Code § 6-3-2-2(l) and (m) authorize it to adjust Dupont's Indiana tax base by disallowing Dupont's interest deductions, this Court has already explained that while Indiana Code § 6-3-2-2(l) permits the Department to divide a taxpayer's tax base differently than the Standard Sourcing Rules (i.e., those contained in Indiana Code § 6-3-2-2(a) through (k)), it does not allow the Department to adjust the taxpayer's Indiana income tax base. See Columbia Sportswear USA Corp. v. Indiana Dep't of State Revenue, 45 N.E.3d 888, 896 (Ind. Tax Ct. 2015), review denied. Moreover, the Court has previously noted the inescapeable similarity between the text of Indiana Code § 6-3-2-2(m) and I.R.C § 482. See Rent-A-Ctr. E., Inc. v. Indiana Dep't of State Revenue, 42 N.E.3d 1043, 1050 (Ind. Tax Ct. 2015), review denied. As a result, § 482's arm's-length standard applies in determining whether intercompany charges fairly reflect and report the income derived from Indiana sources for purposes of applying the remedy under Indiana Code § 6-3-2-2(m). Because the interest rates on Dupont's loans were arm's-length, supra, pp. 17-18, Indiana Code § 6-3-2-2(m) does not authorize the Department's denial of Dupont's interest expense deductions.

In addition, the Department maintains that Indiana Code § 6-3-2-20 permits it to disallow DuPont's interest deductions that are "directly related intangible interest expenses," (see, e.g., Resp't Br. at 11-12; Resp't Des'g Evid., Confd'l Ex. 8 at 15), the plain language of the statute makes it clear that it applies to interest expenses related to royalty, trademark, and copyright expenses or substantially similar types of intangible

19

assets.  See IND. CODE § 6-3-2-20(a)(2), (4), and (5) (2007).  See also Caylor-Nickel Clinic, P.C. v. Indiana Dep't of State Revenue, 569 N.E.2d 765, 768 (Ind. Tax Ct. 1991) (explaining that the foremost goal of statutory construction is to determine and give effect to the true intent of the legislature, which is embodied in the plain, ordinary, and usual meaning of the statute's words), aff'd, 587 N.E.2d 1311 (Ind. 1992).

The Department's arguments have failed to show that DuPont's loan transactions with DEC/DGOI lack economic substance.  As a result, the Department's disallowance of DuPont's interest expense deductions claimed on its 2006 and 2007 returns was improper.

## IV.  R&D Expense Deduction

DuPont further claims that the Department erred when it disallowed its 2007 R&D expense deduction.  In 2007, DuPont incurred approximately $43 million in R&D expenses. (Pet'r Des'g Evid., Vol. III, Aff. of Nolan S. Barrick ("Barrick Aff.") ¶ 3.)  DuPont deducted these expenses on its Indiana return, but on audit the Department disallowed the deduction because DuPont took a credit for them rather than a deduction at the federal level.  (Resp't Des'g Evid., Confd'l Ex. 8 at 17.)

For purposes of its 2007 federal income tax return, DuPont was entitled to take either a deduction or a credit for its R&D expenses, but it was statutorily prohibited from taking  both.  See generally I.R.C. §§ 41, 174, 280C(c)(1) (2007).  DuPont took the credit. (Barrick Aff. ¶ 4.)  A federal R&D expense credit does not reduce a taxpayer's federal taxable income; rather, it reduces dollar-for-dollar the tax liability based on that federal taxable income.  See, e.g., BLACK'S LAW DICTIONARY at 475, 1599 (explaining generally that a tax deduction reduces a taxpayer's gross income to arrive at its taxable income, while a

20

tax credit reduces the taxpayer's liability on that taxable income); IRS, https://www.irs.com/articles/tax-credits-vs-tax-deductions (last visited Jan. 30, 2017).

DuPont's election to take the federal R&D expense credit instead of the deduction had a significant effect on how its R&D expenses were treated on its 2007 Indiana income tax return. Indiana's statutory scheme does not provide a state R&D expense deduction, only an R&D credit. Compare IND. CODE §§ 6-3-2-.03 through -25 (2007) with IND. CODE §§ 6-3.1-4-1 through -5 (2007). An Indiana R&D expense deduction is unnecessary because the starting place for reporting adjusted gross income on an Indiana income tax return is federal taxable income, which already would have been reduced by the amount of the R&D expenses if the federal deduction was elected. See, e.g., IND. CODE § 6-3-1-3.5(b) (2007); Subaru-Isuzu, 782 N.E.2d at 1075.

Here, DuPont did not take an R&D credit on its Indiana return, alleging that it was not available. (See Pet'r Br. at 43 (citations omitted).) Moreover, DuPont's federal taxable income did not include the benefit of its R&D expenses. Nonetheless, DuPont deducted its R&D expenses from the taxable income starting place reported on its Indiana return, explaining that because "Indiana does not allow the federal R&D tax credit as part of its corporate income tax starting point, [DuPont's] actual R&D expenses . . . which would otherwise be deductible for Federal income tax purposes, should be deductible in calculating [its Indiana] corporate income tax base." (Resp't Des'g Evid., Confd'l Ex. 8 at 16 (emphasis added).) (See also Barrick Aff. ¶ 6; Resp't Des'g Evid., Confd'l Ex. 2O at DIN 806.) DuPont supports its deduction based on the Court's previous explanation that

21

> Indiana adjusted income begins with federal taxable income <u>as defined by</u> I.R.C. § 63, not <u>as reported by</u> the taxpayer. Thus, the issue is not what number appears on line 28 of a taxpyer's federal income tax form 1120 but whether a particular item of income was included in taxable income pursuant to I.R.C. § 63.

(Pet'r Br. at 43 (quoting <u>Cooper Indus. v. Indiana Dep't of State Revenue</u>, 673 N.E.2d 1209, 1213 (Ind. Tax Ct. 1996)).)

DuPont's deduction, however, was improper for the following two reasons. First, Indiana does not provide a specific deduction from the adjusted gross income tax base (I.R.C. § 63 taxable income) for R&D expenses under Indiana Code § 6-3-1-3.5 or any other statute. Second, DuPont's election to take the federal R&D expense credit rather the the federal R&D expense deduction carried with it a consequence: its I.R.C. § 63 taxable income cannot include a deduction for the same R&D expenses taken as a federal credit. <u>See</u> I.R.C. § 208C(c)(1). Thus, based on the proper calculation of its taxable income under I.R.C. § 63, without regard to what it reported on its federal tax return, DuPont's Indiana deduction was improper as a matter of law.


### V.  2007 Penalty

Finally, DuPont argues that the Department had no basis for imposing the negligence penalty against it for the 2007 tax year. (<u>See</u> Pet'r Br. at 44.) More specifically, DuPont argues that the penalty was improper because it had reasonable cause to believe that it properly completed its return given its interpretation of the applicable Indiana tax law. (<u>See</u> Pet'r Br. at 44.)

Indiana Code § 6-8.1-10-2.1 provides that a taxpayer is subject to a 10% penalty if he fails to timely file his tax return, fails to pay his tax liability by the due date, or incurs a

22

tax deficiency "due to negligence." IND. CODE § 6-8.1-10-2.1(a)-(b) (2007) (amended 2013). Nonetheless, the statute goes on to explain that

> [i]f a person subject to the penalty imposed under this section can show that the failure to file a return, pay the full amount of tax shown on the person's return, timely remit tax held in trust, or pay the deficiency determined by the [D]epartment was due to reasonable cause and not due to willful neglect, the [D]epartment shall waive the penalty.

I.C. § 6-8.1-10-2.1(d). While the statute does not define "reasonable cause" or "willful neglect," one of the Department's administrative regulations provides this guidance:

> "[n]egligence" on behalf of a taxpayer is defined as the failure to use such reasonable care, caution, or diligence as would be expected of an ordinary reasonable taxpayer. Negligence would result from a taxpayer's carelessness, thoughtlessness, disregard or inattention to duties placed upon the taxpayer by the Indiana Code or [D]epartment regulations. Ignorance of the listed tax laws, rules and/or regulations is treated as negligence. . . . Negligence shall be determined on a case by case basis according to the facts and circumstances of each taxpayer.
>
> * * * * *
>
> In order to establish reasonable cause, the taxpayer must demonstrate that it exercised ordinary business care and prudence in carrying out or failing to carry out a duty giving rise to the penalty imposed[.] . . . Reasonable cause is a fact sensitive question and thus will be dealt with according to the particular facts and circumstances of each case.

45 IND. ADMIN. CODE 15-11-2(b), (c) (2007).

Based on the evidence before it, the Court finds that the portion of DuPont's 2007 tax deficiency related to the nonbusiness/business income classification issue, as well as the interest expense deduction issue, was incurred due to reasonable cause and not willful neglect. Indeed, DuPont has successfully litigated those two issues that affected the computation of its 2007 AGIT liability; thus, its "differences in its interpretation of the applicable Indiana tax law" were reasonably based, and the penalty attributable to those issues should be waived.

23

The portion of DuPont's 2007 tax deficiency that was related to its R&D expense deduction was not successfully litigated. Nonetheless, DuPont's interpretation that "taxable income" comprised anything that was includable under I.R.C. § 63 was not unreasonable given the emphasis in <u>Cooper</u> decoupling what was <u>includable</u> in taxable income from what was <u>reported</u> as taxable income on the federal return. To the extent the Court has taken a broader view – that one must look beyond I.R.C. § 63 in determining what is includable in "taxable income" – does not make DuPont's view unreasonable or due to willful neglect for purposes of the penalty. Consequently, the penalty related to that issue is also waived.

## CONCLUSION

For the aforementioned reasons, summary judgment is GRANTED to DuPont with respect to issues II, III, and V. Summary judgment is GRANTED to the Department with respect to issues I and IV.

SO ORDERED this 11th day of July 2017.

_____
Martha Blood Wentworth, Judge
Indiana Tax Court

DISTRIBUTION:

Francina A. Dlouhy, Daniel R. Roy, Hollis L. Hyans, Winston Lin

24